**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

ERIC CHARLES RODNEY KNAPP,                    No. CIV S-05-2520-FCD-CMK-P

             Plaintiff,

    vs.                                                                  FINDINGS AND RECOMMENDATIONS

RODERICK HICKMAN, et al.,

             Defendants.

_____/

        Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is Defendants' motion for summary judgment (Doc. 201).  Plaintiff filed an opposition to the motion (Doc. 209), and Defendants filed a reply (Doc. 218).  Plaintiff also filed a motion to strike (Doc. 220) Defendants' reply, to which Defendants filed an opposition (Doc. 221) and Plaintiff filed a reply (Doc. 222).

**I.  BACKGROUND**

**A.      Plaintiff's Allegations**

        The claims remaining in this case relate to Plaintiff's allegations that he has been retaliated against for exercising his constitutional rights, including freedom of speech, press, assembly and redress.  He claims this retaliation began in June 2000, while he was housed at Mule Creek State Prison (MCSP).  He claims the defendants filed false discipline reports, placed him in administrative segregation (ad-seg), confiscated documents, placed him in a holding cage, caused food to be contaminated, confiscated his winter jacket, subjected him to strip searches and

1

public exposure, involuntary medication, witness intimidation, denied him medication, and had him transferred to a higher-security prison.  He claims these acts of retaliation were done in response to his constitutionally protected rights, including informally reporting defendant Kaiser's inappropriate behavior, conversing with visitors, posting information on a bulletin board, filing inmate grievances, warning other prisoners about contaminated food, and speaking freely.

**B.**   **Undisputed Facts**[1]

1.   On June 20, 2000, Plaintiff wrote a letter to Captain Mendoza regarding a mural painting project in the visiting room that had been canceled.  In the letter, Plaintiff stated that he was writing to inform Captain Mendoza about the history of the project, to "reveal to you the patience and stamina c/o Kaiser has shown despite the lack of cooperation she has been given by various institution staff members" and to express his regret in beginning the project. (Plaintiff's Ex. B at 24-25, Doc. 213 at 122-23.)

2.   On July 2, 2000, July 4, 2000, and July 9, 2000, Plaintiff's visits were terminated early.  (Def. Stmt of Material Undisputed Facts ("DUF"), Doc. 202, #6)[2]

3.   On July 10, 2000, Plaintiff submitted a 602 Inmate Grievance regarding his early visit terminations.  (Plaintiff's Ex. B at 35-37, Doc. 213 at 132-134; Defense's Ex. A at 2-12, Doc. 202-1.)

4.   On July 12, 2000, defendant Kaiser issued Plaintiff a Rules Violation Report (RVR), form CDC 115, for his conduct in the visiting room on July 4, 2000.  The charge was "Delaying a Peace Officer in the Performance of His/Her Duties," a division D offense.  A

---

[1]   Most of the facts are not disputed as to the events which occurred.  The dispute between the parties relates to the motivation and/or reason the events occurred.  Plaintiff's contention is that the defendants acted arbitrarily and capriciously, with the purpose of harassing him.  Defendants contend their actions were reasonably related to legitimate penological purposes.

[2]   The undersigned cites to the facts set forth in Defendants' Statement which are not disputed by Plaintiff in his Response thereto (Doc. 210).

hearing was held on July 16, 2000, wherein Plaintiff was found guilty of a reduced charge "Refusing a Direct Order," a division F offense.  (Defense Ex. A at 33-39, Doc. 202-1.)

5.   Lieutenant Etheredge's only involvement with the rules violation report was the classification decision he made, and referral to the senior hearing officer, on July 13, 2000.  (DUF #3)

6.   Lieutenant Etheredge was unaware of Plaintiff's inmate appeal at the time he classified and referred the rules violation report to the senior hearing officer.[3]  (DUF #4)

7.   Plaintiff's grievance activity shows that he submitted in excess of thirty inmate appeals before the commencement of this action.  (DUF #5)

8.   Plaintiff was informed on July 4, 2000, that Officer Kaiser was going to issue a rules violation report for his conduct in visiting on that day.[4]  (DUF #7)

9.   Officer Kaiser issued a CDC 128-A custodial counseling chrono on November 3, 2000, regarding visiting with others. (DUF #8)

10.   Officer Kaiser issued a CDC-128-B informational chrono dated March 15, 2001, regarding grooming standards.[5]  (DUF #9)

11.   The chrono also documents that Plaintiff appeared to have a negative attitude toward her.  (DUF #12)

12.   Under the California Code of Regulations, except for immediate family members, visiting with more than one inmate on the same occasion requires the approval of the

---

[3]   Plaintiff denies this is an undisputed fact, but fails to provide any reason for disputing it.  Bald statements of denial are insufficient to bring facts into dispute.

[4]   Plaintiff acknowledges defendant Kaiser told him she was going to write him up, but he denies that he was informed of the alleged charge.  (See Pl.'s Ex. B at 26-27 (journal entry acknowledging Kaiser warned him of receiving a 115)).

[5]   Plaintiff denies the chrono documented a conversation between himself and defendant Kaiser on March 15, 2000.  In addition, while he denies he was out of compliance with the grooming standards then in place for having a 30 hour old stubble, he acknowledges he was not cleanly shaven.  (Plaintiff's Ex. B at 169, Doc. 213 at 89.)

warden or regional parole administration where the inmates are confined.  (DUF #16)

13.    Plaintiff did not have authorization to visit with anyone other than his approved visitor.[6]  (DUF #17)

14.    Officer Kaiser was required to enforce the visitation rules and to report violations.  (DUF #18)

15.    On November 3, 2000, Officer Kaiser observed Plaintiff conversing with another prisoner and the other prisoner's visitors. (DUF #19 & response thereto).

16.    The grooming regulations, then in effect, provided that an inmate's face was to be clean shaven at all times, except for a mustache or medical exception, neither of which applied to Plaintiff.  (DUF #27)

17.    Upon receipt of information that Plaintiff may intend to take his own life, Plaintiff was escorted to the main infirmary and referred for evaluation.  (DUF # 32)

18.    Medical staff determined that Plaintiff did not pose an immediate threat to himself. (DUF # 33)

19.    Personnel from the CIA indicated they would contact the institution and schedule an interview with Plaintiff.  (DUF #34)

20.    Plaintiff was confined to the ASU pending further review.   (DUF #35)

21.    Captain Warren's only involvement in this decision was an administrative review two days later. (DUF #36)

22.    Plaintiff met with the Institutional Classification Committee (ICC) on September 26, 2001, for his initial ad-seg placement review. (DUF #37)

23.    The committee elected to release Plaintiff to Facility B general population. (DUF #38).

/ / /

---

[6]    Plaintiff agrees this is undisputed, but disputes the definition of "visitor" to the extent that social pleasantries are allowed to be exchanged between various visitors and inmates.

24.     Associate Warden Brown's only involvement in Plaintiff's ad-seg confinement was as a member of the committee that reviewed his placement and released him back to his yard.  (DUF #39)

25.     As the result of Plaintiff's inmate appeal, Log No. MCSP 01-03110, Warden Knowles ordered the amendment of the September 2001, classification chrono.  (DUF #40)

26.     AW Brown did not prepare the original classification chrono.  (DUF #41)

27.     Officer Hogan actually removed the materials from the bulletin board upon Captain Warren's order. (DUP #44)

28.     The California Code of Regulations, Title 15, section 3250 allows for the publication and distribution of an inmate publication only with the institution head's specific approval.  (DUF #47)

29.     Additionally, section 3230 allows for the distribution of Inmate Advisory Council material upon the approval of the warden or his designee.  (DUF #48).

30.     Plaintiff posted personal documents on facility bulletin boards.  (DUF #49)

31.     These documents did not meet the criteria as an inmate publication nor Inmate Advisory Council material.  (DUF #50)

32.     Further, the posting of these materials was not approved by facility staff. (DUF #51)

33.     These items were confiscated.  (DUF #52)

34.     Defendants Kaiser, King, and Warren were not personally involved in Plaintiff's claim concerning Officer Smith requiring him to have his ID card on display instead of in his pocket when he entered the dining facility, on May 29, 2002.  (DUF #56)

35.     Section 3019 provides that inmates must carry on their person any identification and privilege card issued for purposes of identification, and surrender his

1   identification card at the request of any employee.  (DUF #60)

2         36.    Plaintiff admits that on May 30, 2002, Officer Ellis, not Officer Smith,

3   escorted him to the program office and placed him in a cage.  (DUF #62)

4         37.    Plaintiff admits that on May 30, 2002, Sergeant Murray was the only

5   correctional officer involved in his claim that he was made to eat standing up in a holding cage.

6   (DUF #63)

7         38.    Neither Lieutenant Gutierrez nor Officer Smith were personally involved

8   in the screen out of Plaintiff's inmate appeal on May 31, 2002.  (DUF #64)

9         39.    An appeal dated May 31, 2002, complaining of harassment by Sergeant

10   Murray and Officer Smith on May 29 and 30, 2002, was screened out as a duplicate appeal by

11   E.A. Reyes, CCII.  (DUF #65)

12         40.    Neither Lieutenant Gutierrez nor Officer Smith were aware of the

13   December 6, 2001, letter to State Senator Vasconcellos.  (DUF #66)

14         41.    They were neither the recipient of the letter nor did they receive a courtesy

15   copy.  (DUF #67)

16         42.    Neither Lieutenant Gutierrez nor Officer Smith were aware of the January

17   18, 2002, lawsuit.  (DUF #68)

18         43.    Neither of them was named as a defendant, nor served with a copy of the

19   complaint.  (DUF #69)

20         44.    None of the named defendants – Kaiser, King, and Warren – mentioned

21   the lawsuit to them.  (DUF #70)

22         45.    Captain Lattimore did not mention this lawsuit to either Lieutenant

23   Gutierrez or Officer Smith.  (DUF #71)

24         46.    Neither Lieutenant Gutierrez nor Officer Smith were aware of the March

25   11, 2002, letter to the senate public safety committee.  (DUF #72)

26   / / /

47.     They were neither the recipient of the letter nor did they receive a courtesy copy.  (DUF #73)

48.     Plaintiff was found guilty of disruptive behavior during an emergency count as a result of MCSP RVR B09/02-013.  Officer Poe was the reporting employee, Lieutenant Gutierrez was the senior hearing officer, and Captain Lattimore was the reviewer. (DUF #78)

49.     Emergency counts are only conducted based upon information that an inmate has possibly escaped from the institution.  (DUF #80)

50.     When this occurs, it is necessary to confirm that all inmates are accounted for as soon as possible.  (DUF #81)

51.     In the event of an escape, it is imperative that the escapee be identified as quickly as possible to assist in apprehending the escapee.  (DUF #82)

52.     An investigation into a food contamination incident concluded on February 6, 2003.  (DUF #86)

53.     The central kitchen is located on Facility C and is staffed by Facility C general population inmates.  (DUF #89)

54.     On February 10, 2003, Plaintiff was placed in ad-seg.  (DUF #92)

55.     Lieutenant Etheredge reported that on the day of the razor blade incident, Inmate Bristow and Inmate Ramos were observed entering the dining hall together.  (DUF #105)

56.     After receiving their food trays and sitting at the same table, a piece of razor blade was discovered by Inmate Ramos in his food tray.  (DUF #106)

57.     Inmate Bristow immediately stood up and yelled out to the other inmates that there were razor blades in the food.  (DUF #107)

58.     After Inmate Ramos found a second piece of a razor blade in his tray, sergeant Gentile took the tray and contents to the cook's office.  (DUF #108)

/ / /

59.     Staff cook Sampson found a third piece upon further inspection of Ramos' food tray.  (DUF #109)

60.     A search of the remaining main dish in the serving trays in the kitchen did not produce evidence of any other contamination.  (DUF #110)

61.     In February 2003, Officers Hein and Keeland did search Plaintiff's cell and confiscated a state issue, blue quilted nylon jacket.  (DUF #114)

62.     A review of Plaintiff's property records indicated that he was issued such a jacket in November 2001, while assigned to the Facility B yard crew.  (DUF #115)

63.     In January 2002, Plaintiff was reassigned to the vocational mill and cabinet shop.  (DUF #116)

64.     The confiscated jacket was intended only for inmates assigned to the yard crew, and Plaintiff was not entitled to possession of it.  (DUF #117-118)[7]

65.     Plaintiff submitted two inmate appeals claiming retaliatory cell searches by Officers Keeland and Hein in February:  MCSP Log No. 03-00855, and an unlogged appeal, both submitted February 2, 2003.  (DUF #119)

66.     Captain Lattimore participated in the first level response to Plaintiff's appeal No. 03-00885.  (DUF #120)

67.     Captain Warren and Lieutenant Gutierrez had no involvement in the processing of either appeal  (DUF #121)

68.     Appeals Coordinator Hansen, a non-party, was responsible for processing these appeals.  (DUF #122)[8]

---

[7]     Plaintiff does not dispute the specific type of jacket confiscated was for use by yard crew inmates only; rather he objects that he was in need of extra protective clothing due to the climate at MCSP during the winter, and this was his only jacket.

[8]     In response to this undisputed fact, Plaintiff clarifies that Claim 10e is only against defendants Hein and Lattimore for their role in the review of his grievance.  (Response to DUF #122, Doc. 210, at 32).

69.     Defendants Etheredge, Gutierrez, Lattimore, Sauceda, and Warren were not personally involved in the day to day operation of the ad-seg unit in which Plaintiff was housed commencing February 10, 2003.  (DUF #123)

70.     Correctional Officer M. Roberts was the assigned investigative employee for Plaintiff's RVR Log #B02/03-025, and his report was reviewed by Facility Captain Lattimore.  (DUF #124)

71.     Plaintiff submitted questions for Captain Warren and Lieutenant Gutierrez, and for his inmate witnesses.  (DUF #125)

72.     Some of Plaintiff's questions were disallowed, others were asked.  (DUF #128)

73.     Seven of Plaintiff's inmates witnesses responded to Plaintiff's questions.  (DUF #129)

74.     Other inmate witnesses Plaintiff had requested were unwilling to respond to his questions.  (DUF #130)

75.     Plaintiff was placed on involuntary medication beginning February 11, 2003 (DUF #134)

76.     In March 2003, Plaintiff appealed the involuntary medication, stating on March 5, 2003, that he was "neither gravely disabled nor mentally incompetent."  (DUF #137)

77.     Also on March 5, 2003, Plaintiff stated that he wanted to stop taking all psychotropic medications.  (DUF #138)

78.     Plaintiff met with Richard Lipon, M.D. and Senior Psychiatrist, on March 12, 2003, concerning his inmate appeal.  (DUF #129)

79.     At this time, Plaintiff consented to continue being given Risperdal in a tapered dose.  (DUF #140)

80.     Subsequently, Plaintiff refused all medications with the exception of Fluoxetine once per week.  (DUF #141)

81.     Rules violation report, MSCP B03/055 dated February 25, 2003, was under investigation when Plaintiff was first placed in ad-seg on February 10, 2003.  (DUF #143, 161)

82.     As a result of the investigation, which concluded February 25, 2003, Plaintiff was charged with misuse/unauthorized acquisition of state funds and state property valued at $135.78, relating to inmate canteen use.  (DUF #163)

83.     The hearing officer found Plaintiff guilty of the charge of misuse/unauthorized acquisition of state funds and state property.  (DUF #144, 169)[9]

84.     Under California Code of Regulations, title 15 § 3012, inmates may not obtain anything by theft, fraud, or dishonesty.  (DUF #170)

85.     However, the offense was reduced to an administrative offense.  (DUF #145)

86.     The disposition was limited to time served in ad-seg, and a trust account withdrawal order was submitted to the trust office.  (DUF #146)

87.     Inmate appeal MCSP Log No. 03-00861 grieved Plaintiff's RVR MCSP Log No. B03/055 dated February 25, 2003.  (DUF #147)

88.     Because the offense was reduced to an administrative violation, the second level review dated May 27, 2003, completed the exhaustion requirement as to this disciplinary action.  (DUF #148)

89.     The grievance process having been timely completed, then there was no adverse action with respect to inmate appeal MCSP Log. No. 03-00861.  (DUF #149)[10]

/ / /

/ / /

---

[9]     Plaintiff disputes the validity of the charge.

[10]     Plaintiff does not deny this statement, but claims the appeal was not handled by the proper authority.

90.     During disciplinary detention in ad-seg, an inmate's legal resources are limited, by law, to pencil and paper.  (DUF #150)[11]

91.     Other legal material in an inmate's personal property may be issued to an inmate in disciplinary detention if litigation was in progress before the inmate's placement in ad-seg and legal due dates are imminent.  (DUF #151)

92.     Here, Plaintiff does not allege that he had any pending actions with imminent deadlines between February 10, 2003 and April 29, 2003.  (DUF #152)[12]

93.     On April 7, 2003, Plaintiff was found guilty in RVR B02/03-025 (related to the food contamination events) and was assessed a suspended security housing unit (SHU) term.  (DUF #156)

94.     On April 10, 2003, Plaintiff was retained in ad-seg pending transfer.  (DUF #157)

95.     On April 29, 2003, Plaintiff was transferred to CSP-Sac.  (DUF #171)

96.     Prior to his transfer, Plaintiff wrote to Warden Knowles indicating that he did not want to transfer from MCSP because of his protective needs and to facilitate family visiting.  (DUC #172)

97.     Plaintiff claimed that he could peacefully co-exist with all inmates on Facility B and he wanted an opportunity to sign peaceful co-existence chronos with any declared enemies.  (DUF #173)

98.     Plaintiff further requested that any inmate who could not co-exist with him should be transferred so he could reside on Facility B.  (DUF #174)

99.     Warden Knowles responded on March 23, 2003, after a review of Plaintiff's central fie in connection with his request.  (DUF #175)

---

[11]     Plaintiff disputes that he has ever been assigned to any disciplinary detention.

[12]     However, Plaintiff contends that he was entitled to have up to seven cubic feet of legal materials throughout that time period.

1    100.    Plaintiff had been placed in ad-seg on February 20, 2003.  (DUF #176)

2    101.    At the time of the warden's response, both rules violation reports (03-025,

3    03-055) were pending adjudication.  (DUF #178)

4    102.    Warden Knowles acknowledged Plaintiff's sensitive needs, and noted that

5    they will be considered in any decision impacting his future housing. (DUF #187)

6    103.    Plaintiff's future placement would be determined by the interdisciplinary

7    treatment team and the institutional classification committee following the adjudication of the

8    pending RVRs.  (DUF #188)

9    104.    Plaintiff was encouraged to be present at the classification committee and

10   to inform the committee of his preferences.  (DUC #189)

11   105.    Plaintiff wrote letters to MCSP Appeals Coordinator T. Hansen dated June

12   19, and July 30, 2003.  (DUF #194)

13   106.    RVR #A-03-09-004 (originally MCSP log #B06/03-035 and SAC log #A-

14   03-07-007) was issued by T. Hansen as the reporting employee, and Captain Lattimore as the

15   reviewing supervisor.  (DUF #195)

16   107.    RVR #A-03-08-002 was issued by T. Hansen as the reporting employee,

17   and Correctional Sergeant J.D. Nelson as the reviewing supervisor.  (DUF #196)

18   108.    Both rules violation reports charged Plaintiff with disrespect to staff based

19   on the content of the June 19, and July 30, 2003, letters.  (DUF #197)

20   109.    Plaintiff was found guilty on both charges.  (DUF #198)

21   110.    In his inmate appeal interview regarding his first RVR, Plaintiff admitted

22   to Lieutenant Padilla that he intended his letter to Counselor Hansen to be disrespectful and

23   contemptuous.  (DUF #199)

24   111.    In his interview regarding the second RVR, Plaintiff admitted to Sergeant

25   Garcia that his intentions were to be disrespectful to Counselor Hansen.  (DUF #200)

26   / / /

1          112.    Lieutenant Gutierrez was not personally involved in either of the rules

2  violation reports concerning the June 19, and July 30, 2003, letters.  (DUF #201)

**C.**     <u>**Mutual Evidence**</u>

4          Both parties submitted essentially identical evidence related to the various Rules

5  Violation Reports (RVR) and 602 Inmate Grievance Forms.  The documents included within

6  each varied, such as Plaintiff's 602s did not include the grant or denial letters, and Plaintiff's

7  RVRs included additional documents such as his defense statements, witness questions

8  submitted, and hearing reports.  However, as the parties do not dispute the events evidenced by

9  the RVRs and 602s, those are identified below:

10          1.    July 4, 2000:  RVR B07-00-012 (signed July 12, 2000).  Charge: Delaying

11  a Peace Officer in the Performance of his/her Duties on July 4, 2000; Finding: Guilty of Refusing

12  a Direct Order, a reduced charge. (Def. Ex. A at 18-24, 33-39; Pl. Ex. C at 34-36).

13          2.    July 10, 2000:  602 MCSP 00-01495, regarding visit terminations. (Def.

14  Ex. A at 2-12; Pl. Ex. B at 35-37).

15          3.    July 19, 2000:  602 MCSP 00-01764, challenging guilty finding in RVR

16  B07-00-012.  (Def. Ex. A at 27-32; Pl. Ex. B at 38-40).

17          4.    November 3, 2000:  CDC 128 A counseling chrono, regarding conversing

18  with others during visit.  (Def. Ex. A at 40; Pl. Ex. C at 46).

19          5.    March 15, 2001:  CDC 128 B informative general chrono, regarding

20  grooming standards for visits.  (Def. Ex. A at 41; Pl. Ex. B at 148, 169).

21          6.    September 24, 2001: Administrative Segregation placement.  (Def. Ex. A

22  at 42-44; Pl. Ex. C at 55-57).

23          7.    September 25, 2001: CDC 128 B Unusual Behavior chrono, regarding

24  refusal of food, water, clothing, bedding in ad/seg.  (Def. Ex. A at 45; Pl. Ex. C at 59-60).

25          8.    September 26, 2001: CDC 128 G ICC classification, releasing Plaintiff

26  from ad/seg.  (Def. Ex. A at 51; Pl. Ex. C at 61).

9.      November 1, 2001: 602 MCSP 01-0317, regarding removal of documents from bulletin boards.  (Def. Ex. A at 61-78; Pl. Ex. B at 320-24).

10.     November 4, 2001: 602 MCSP 01-03110, regarding false statement in CDC 128 G.  (Def. Ex. A at 47-60; Pl. Ex. B at 325-28).

11.     May 29, 2002: 602 MCSP 02-01393, regarding requirement to show identification.  (Def. Ex. A at 79-92; Pl. Ex. B at 411-13, 416-17).

12.     September 6, 2002:  RVR 02-013 (signed 9/11/02).  Charge: Disruptive Behavior During Emergency Count; Finding: Guilty.  (Def. Ex. A at 93-104; Pl. Ex. C at 69-119).

13.     December 12, 2002: 602 MCSP 02-02585 challenging RVR 02-013 decision.  (Def. Ex. A at 105-110; Pl. Ex. B at 477-87).

14.     February 6, 2003: RVR 03-025 (signed 2/20/03).  Charge: Conspiracy to Commit Extortion; Finding: Guilty (Def. Ex. A at 111-39; Pl. Ex. C at 200-05, 249-67).

15.     February 2, 2003: 602 MCSP 03-0855, regarding cell search and jacket confiscation.  (Def. Ex. A at 142-46; Pl. Ex. B at 607-10).

16.     February 10, 2003: Administrative Segregation placement.  (Def. Ex. A at 2140; Pl. Ex. C at 191).

17.     February 25, 2003: RVR 03-055.  Charge: Misuse/Unauthorized Acquisition of State Funds & State Property Valued at $135.78; Findings: Guilty, reduced to administrative offense. (Def. Ex. A at 151-74; Pl. Ex. C at 297-303).

18.     March 2003:  602 MCSP 03-0496, regarding involuntary medication. (Def. Ex. A at 147-50; Pl. Ex. B at 695-81).

19.     April 16, 2003: 602 MCSP 03-00861, challenging RVR 03-055 disposition.  (Def. Ex. A at 177-183).

20.     June 23, 2003: RVR 03-035.  Charge: Disrespect to Staff; Finding: Guilty, reduced to CDC 128-A. (Def. Ex. A at 189-200; Pl. Ex. C at 346-53).

14

21.     August 7, 2003: 602 MCSP 03-01971, challenging RVR 03-035 disposition.  (Def. Ex. A at 186-88; Pl. Ex. B at 961-66).

22.     August 4, 2003: RVR A-03-08-002.  Charge: Disrespect to Staff; Finding: Guilty.  (Def. Ex. A at 217-21).

23.     September 24, 203: 602 SAC-A-03-02216, challenging RVR 03-08-002 disposition.  (Def. Ex. A at 207-26; Pl. Ex. B at 984-88).

**D.     Plaintiff's Evidence**

In addition to the above, Plaintiff submits numerous articles, e-mail and correspondence written by himself, his mother, and his other "associates."  He also submits numerous journal entries.  A majority of this evidence relates to claims which have been dismissed, or is irrelevant as it is an attempt to support his claims regarding the rights of his "associates."  His journal entries, however, are signed "under penalty of perjury" and therefore are construed as declarations for the purpose of this motion.  Those relevant to the remaining claims have been read and considered.

**E.     Defendants' Evidence**

In addition to the above, Defendants have submitted numerous declarations in support of their position.  These declarations have similarly been read and considered.


**II.  STANDARDS FOR SUMMARY JUDGMENT**

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here

the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary
judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers
to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,
after adequate time for discovery and upon motion, against a party who fails to make a showing
sufficient to establish the existence of an element essential to that party's case, and on which that
party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning
an essential element of the nonmoving party's case necessarily renders all other facts
immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as
whatever is before the district court demonstrates that the standard for entry of summary
judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

        If the moving party meets its initial responsibility, the burden then shifts to the
opposing party to establish that a genuine issue as to any material fact actually does exist.  See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to
establish the existence of this factual dispute, the opposing party may not rely upon the
allegations or denials of its pleadings but is required to tender evidence of specific facts in the
form of affidavits, and/or admissible discovery material, in support of its contention that the
dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party
must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);
T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and
that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict
for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

        In the endeavor to establish the existence of a factual dispute, the opposing party
need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

16

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## III. DISCUSSION

Here, Defendants argue the court should grant their summary judgment motion as they are entitled to qualified immunity as to all but one of Plaintiff's claims. In addition, they argue summary judgment is appropriate because Plaintiff's retaliation claims do not amount to a constitutional violation. Plaintiff counters that qualified immunity is not available because the law governing the defendants conduct was clearly established. Plaintiff also argues genuine issues of material facts exists, so summary judgment is not appropriate.

These arguments will be addressed as to each claim separately.

/ / /

/ / /

1    **A.    RETALIATION**

2              In order to state a claim under 42 U.S.C. § 1983 for retaliation, the prisoner must

3    establish that he was retaliated against for exercising a constitutional right, and that the

4    retaliatory action was not related to a legitimate penological purpose, such as preserving

5    institutional security.  See Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam).

6    In meeting this standard, the prisoner must demonstrate a specific link between the alleged

7    retaliation and the exercise of a constitutional right.  See Pratt v. Rowland, 65 F.3d 802, 807 (9th

8    Cir. 1995); Valandingham v. Bojorquez, 866 F.2d 1135, 1138-39 (9th Cir. 1989).  The prisoner

9    must also show that the exercise of First Amendment rights was chilled, though not necessarily

10   silenced, by the alleged retaliatory conduct.  See Resnick v. Hayes, 213 F.3d 443, 449 (9th Cir.

11   2000), see also Rhodes v. Robinson, 408 F.3d 559, 569 (9th Cir. 2005).  Thus, the prisoner

12   plaintiff must establish the following in order to state a claim for retaliation: (1) prison officials

13   took adverse action against the inmate; (2) the adverse action was taken because the inmate

14   engaged in protected conduct; (3) the adverse action chilled the inmate's First Amendment

15   rights; and (4) the adverse action did not serve a legitimate penological purpose.  See Rhodes,

16   408 F.3d at 568.

17             The court must "'afford appropriate deference and flexibility' to prison officials in

18   the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."

19   Pratt, 65 F.3d at 807 (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  The burden is on

20   plaintiff to demonstrate "that there were no legitimate correctional purposes motivating the

21   actions he complains of."  Id. at 808.  "[A] plaintiff must show that his protective conduct was

22   'the "substantial" or "motivating" factor behind the defendant's conduct.'"  Brodheim v. Cry, 584

23   F.3d 1262, 1271 (9th Cir. 2009) (quoting Soranno's Gasco, Inc. V. Morgan, 874 F.2d 1310, 1314

24   (9th Cir. 1989)).  However, a retaliation claim cannot be defeated on summary judgment "simply

25   by articulating a general justification for a neutral process, when there is a genuine issue of

26   material fact as to whether the action was taken in retaliation for the exercise of a constitutional

1   right." <u>Bruce v. Ylst</u>, 351 F.3d 1283, 1289 (9th Cir. 2003).

2         In general, Plaintiff's claim of retaliation stems from his position that he retains

3   all of his First Amendment rights, unabated, while incarcerated.  However, Plaintiff's position is

4   not supported by United State Supreme Court precedent.  Instead, the Supreme Court has

5   continuously held "a prison inmate [only] retains those First Amendment rights that are not

6   inconsistent with his status as a prisoner or with the legitimate penological objectives of the

7   corrections system." <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974).  Indeed, the Supreme Court

8   has long recognized that "(l)awful incarceration brings about the necessary withdrawal or

9   limitation of many privileges and rights, a retraction justified by the considerations underlying

10  our penal system." <u>Price v. Johnston</u>, 334 U.S. 266, 285 (1948).

11  **B.    <u>QUALIFIED IMMUNITY</u>**

12        Government officials enjoy qualified immunity from civil damages unless their

13  conduct violates "clearly established statutory or constitutional rights of which a reasonable

14  person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  In general,

15  qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

16  law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

17  immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting

18  the injury, the facts alleged show the defendant's conduct violated a constitutional right. <u>See</u>

19  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next

20  step is to ask whether the right was clearly established. <u>See id.</u>  This inquiry "must be undertaken

21  in light of the specific context of the case, not as a broad general proposition . . . ." <u>Id.</u>  "[T]he

22  right the official is alleged to have violated must have been 'clearly established' in a more

23  particularized, and hence more relevant, sense:  The contours of the right must be sufficiently

24  clear that a reasonable official would understand that what he is doing violates that right." <u>Id.</u> at

25  202 (citation omitted).  Thus, the final step in the analysis is to determine whether a reasonable

26  officer in similar circumstances would have thought his conduct violated the alleged right. <u>See</u>

19

1   id. at 205.

2       When identifying the right allegedly violated, the court must define the right more

3   narrowly than the constitutional provision guaranteeing the right, but more broadly than the

4   factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667

5   (9th Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be

6   sufficiently clear that a reasonable official would understand [that] what [the official] is doing

7   violates the right."  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the

8   court concludes that a right was clearly established, an officer is not entitled to qualified

9   immunity because a reasonably competent public official is charged with knowing the law

10  governing his conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even

11  if the plaintiff has alleged a violation of a clearly established right, the government official is

12  entitled to qualified immunity if he could have "reasonably but mistakenly believed that his . . .

13  conduct did not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir.

14  2001); see also Saucier, 533 U.S. at 205.

15      The first two steps in the qualified immunity analysis involve purely legal

16  questions.  See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a

17  legal determination based on a prior factual finding as to the government official's conduct.  See

18  Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  In resolving these issues, the court must

19  view the evidence in the light most favorable to plaintiff and resolve all material factual disputes

20  in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

21  **C.   CLAIMS**

22      Many of Plaintiff's claims have previously been dismissed from this action.  The

23  remaining claims in this case are limited to the alleged retaliation set forth in claims 1a-d; 3b-c;

24  3g; 5a; 5c; 7; 8a-c; 8h; 9b-c; 10d-i; 10m; 10o; 10q-s; 10w-x; 12a-b.  (See Docs. 150, 153, 190,

25  194).  Many of Plaintiff's arguments, both in his complaint and in response to the pending

26  motion, raise the issue of third party actions.  In support of his retaliation claim, Plaintiff argues

in part that he was retaliated against due to the activities of his mother and other associates. However, the court has previously determined that Plaintiff does not have third party standing in this case, and he is proceeding with respect to his own alleged injuries, not those of his "associates." (See Docs. 150, 153).  Therefore, to the extent he continues to argue the activities of his "associates" were protected First Amendment actions, the undersigned has not included those arguments here.  Plaintiff can only base his retaliation claim on his own protected activities, not those of others.

In addition, Plaintiff's allegations of protected activity are generally conclusory and abstract.  For the most part, he fails to articulate with any specificity what protected activity he was engaging in which resulted in adverse treatment.  His allegations are generalized statements that he and his "associates" engaged in such activities as mailing correspondence complaining about MCSP-related events and/or circumstances, initiated or further prosecuted grievances, or "otherwise personally engaged in presumably protected First Amendment activity." (See, e.g., Pl. Resp., Doc. 209 at 5).  His failure to specify the alleged protected activity he was actually engaged in makes his claims of retaliation unclear.  As stated above, Plaintiff must demonstrate a specific link between the alleged retaliation and the exercise of a constitutional right.  See Pratt, 65 F.3d at 807.  Simply alleging he was retaliated against because he was well known for advocating prisoner rights is insufficient.  Instead, in order to succeed on a retaliation claim, Plaintiff must be able to show a specific adverse action resulted from a specific protected activity.  Here, most of Plaintiff's claims specify an action from Defendants, but fail to specify what protected activity Plaintiff was engaged in.

### 1.    Claim 1[13]

The defendants named in the Supporting Allegations (Counts)
below deprived Plaintiff and his associates of secured rights, privileges,

---

[13]    The claims set forth herein are taken verbatim from Plaintiff's Third Amended Complaint (Doc. 36), eliminating those defendants and subclaims previously dismissed from this action.

and immunities by causing them to begin suffering an oppressive campaign of retaliatory abuse that was directly linked to Plaintiff documenting KAISER's misconduct, reporting and publicizing it through UNION's Internet web site (1union1.com), and especially petitioning KAISER's supervisors for redress of issues related to KAISER on 6/20/00, 7/3/00, and 7/10/00.

1a:    Beginning in June of 2000, KAISER tried to incite animosity and violence in several prisoners toward Plaintiff and Plaintiff's fiancee.

1b:    On 7/2/00 and 7/4/00, KAISER . . . caused Plaintiff and Plaintiff's fiancee to suffer unauthorized visit terminations in violation of their guaranteed visitation rights under state law.

1c:    On 7/9/00, . . . KAISER . . . caused the last visit between Plaintiff and his fiancee for several weeks to end with KAISER thrusting between them as they said goodbye a photo of Plaintiff's former wife and portrait Plaintiff was drawing therefrom which . . . had [been] illegally taken from Plaintiff's cell.

1d:    Beginning 7/12/00, . . . ETHEREDGE, . . . KAISER . . . caused Plaintiff to suffer retaliatory and false disciplinary action which deprived him of liberty & other rights without the Due Process & Equal Protection guaranteed under state law after and because not only did many prisoners sign his group petition regarding KAISER on 7/3/00 but also he had lawfully spoken freely to KAISER on 7/4/00 and then filed a grievance regarding KAISER on 7/10/00.

As to Claim 1, Defendants argue that the adverse action Plaintiff claims was retaliatory occurred before any alleged protected activity (i.e., an inmate appeal).  In response, Plaintiff argues the initial complaint about defendant Kaiser occurred on June 20, 2000, which is what motivated the other actions complained about.

Plaintiff  alleges the retaliation against him began following his June 20, 2000, letter to Captain Mendoza complaining about the cancellation of a mural project.  (See Pl. Ex. B at 24-25).  He argues this was an assertion of his First Amendment freedom of speech in that he was complaining about defendant Kaiser.  However, a review of that letter fails to show any negative comments about defendant Kaiser.  Rather, Plaintiff praised her for her patience and diligence.  Plaintiff's contention that this letter is protect speech under the First Amendment is unclear.  While prisoners retain the right to file inmate grievances, there in nothing in this letter which could reasonably be construed as a grievance against defendant Kaiser.  At best, it is a complaint about the cancellation of the mural project, not any alleged misconduct of Kaiser.

1    The undisputed evidence shows that Plaintiff had three visits terminated early, on

2  July 2, July 4, and July 9, 2000.  The reason provided for terminating the visits was

3  overcrowding in the visiting room.  During one visit, on July 4, 2000, Plaintiff had a

4  confrontation with defendant Kaiser over the reasons for the termination.  As a result, defendant

5  Kaiser warned Plaintiff that she was going to issue him a Rules Violation Report (RVR) CDC

6  form 115.  In Plaintiff's journal entry, he acknowledges receiving the warning of a write up from

7  defendant Kaiser, but denies she informed him what the exact charge was going to be.  (See Pl.

8  Ex. B at 26-27).  However, defendant Kaiser did not complete and sign this disciplinary 115 until

9  July 12, 2000, which occurred after Plaintiff submitted an inmate grievance, form 602, on July

10  10, 2000, regarding his early visit terminations.  Therefore, Plaintiff argues he received the 115

11  in retaliation for his filing an inmate grievance.

12    While the timing of the 115, in that it was processed after Plaintiff submitted his

13  grievance, may be questionable, it is clear that Plaintiff knew he was going to receive the

14  disciplinary 115 prior to the time he submitted his inmate grievance.  Therefore, Plaintiff fails to

15  meet his burden of showing that the disciplinary proceedings were in retaliation for Plaintiff's

16  protected activity of filing an inmate grievance, rather than for a legitimate penological purpose

17  in response to Plaintiff verbal confrontation with defendant Kaiser.

18    To the extent Plaintiff claims his confrontation with defendant Kaiser on July 4,

19  2000, (the basis for the disciplinary proceedings), was protected activity, the undersigned

20  similarly cannot find such activity was protected free speech.  Again, while inmates may retain

21  some free speech rights, arguing with prison officials cannot necessarily be the type that is

22  retained.  Such actions, personal confrontations between prisoners and correctional officers,

23  necessarily invoke prison security concerns, and must therefore be restricted.  If an inmate

24  disagrees with an officer's decision, there are other means of addressing it rather than a

25  confrontation.  Plaintiff also contends the disciplinary action was motivated by a group petition

26  he had prisoners sign on July 3, 2000.  (Pl. Ex. B at 28-33).  However, Plaintiff offers no

evidence that this petition was submitted to defendant Kaiser at any time, much less prior to the

July 12, 2000, disciplinary 115.  In addition, this petition simply addressed the overcrowding

issue, and resulting early visit terminations several inmates were experiencing.  There is nothing

in the petition regarding defendant Kaiser.  Therefore, it is unclear how this could form the basis

for any retaliation claim.

Finally, Plaintiff's claim indicates some personal involvement of defendant

Etheredge relating to the alleged retaliatory disciplinary actions.  However, Plaintiff concedes

that defendant Etheredge's only involvement in the disciplinary proceedings was the

classification decision he made, and referral to the senior hearing officer.  He argues that

defendant "Etheredge aided, abetted, and otherwise participated in and contributed to Kaiser's

false and retaliatory disciplinary action by arbitrarily and capriciously classifying the RVR as

'Serious' . . . ."  (Doc. 210 at 2). However, defendant Etheredge submitted a declaration which

states that he was unaware of Plaintiff's July 10, 2000, grievance at the time he signed the RVR

on July 13, 2000, classifying the offense.  Plaintiff fails to provide any evidence to the contrary.

The undersigned finds that the defendants have provided evidence establishing

that the disciplinary proceedings instigated on July 12, 2000, relating to Plaintiff's behavior on

July 4, 2000, was not motivated by retaliation for Plaintiff's inmate grievance against defendant

Kaiser.  Specifically, Plaintiff was informed that he would be receiving the disciplinary on the

day of his confrontation with defendant Kaiser, July 4, 2000.  This was prior to Plaintiff

submitting his inmate grievance, the only specific protected activity Plaintiff sets forth as the

basis for his retaliation claim.  Plaintiff has provided no evidence to support his contention that

he retains the  unfettered right to speaking freely while incarcerated.  In addition, the disciplinary

proceeding resulting from Plaintiff's behavior on July 4, 2000, was reasonably related to a

legitimate correctional goal, that is not allowing inmates to confront officers regarding their

decision.  The system has provided a proper way to complain about decisions officers make by

filing an inmate grievance.  While Plaintiff did so, he submitted his inmate grievance on July 10,

2000, with the prior knowledge that he would be receiving the disciplinary action.  The undersigned finds summary judgment to be appropriate relating to this claim.

### 2.    Claim 3

The defendants named in the Supporting Allegations (Counts) below then deprived Plaintiff and his associates further of secured rights, privileges, and immunities by causing the campaign of retaliatory oppression alleged above at Claims 1 and 2 to progress against them as follows in direct relation to their documenting, reporting, publicizing through UNION's Internet web site (1union1.com), and otherwise petitioning for redress of the unlawful events, circumstances, and conditions alleged in Claims 1 and 2 above and in the Supporting Allegations (Counts) below.

3b:    On 11/3/00, . . . KAISER . . . caused not only Plaintiff, his fiancee, and their mutual friends to be falsely told by KAISER that they could not "conversate" with each other while waiting in line together at a vending machine in the visiting room, . . . .

3c:    On 11/9/00, . . . KAISER . . . caused . . . Plaintiff to receive an unauthorized writeup from KAISER for him and his fiancee lawfully speaking with their above friends on 11/9/00 . . . .

3g:    Beginning 1/28/01, . . . KAISER . . . caused Plaintiff to be retaliated against further by KAISER with "Harassment" under state law which included a perjured writeup merely for having slight (if any) beared stubble when twice surprised by unexpected visitors.

In this claim, Plaintiff claims he suffered another disciplinary action from defendant Kaiser in retaliation for conversing with others in the visiting room.  It is unclear what protected activity Plaintiff contends he was engaged in.  In addition, defendant Kaiser has offered a legitimate penological reason for her action, which Plaintiff fails to contradict.

The undisputed evidence shows that Plaintiff received a custodial counseling chrono (CDC 128A) on November 3, 2000, and an informational chrono (CDC-128B) on March 15, 2001.  He argues these "adverse" actions were in retaliation for exercising his alleged First Amendment right to peaceably assemble, that is participate in visiting.[14]

---

[14]    Plaintiff's claim of protected activity in this claim is unclear.  While he makes general, conclusory statements that he was exercising his First Amendment rights, he does not provide any specificity as to what rights he was specifically exercising  Such conclusory allegations, such as that "the defendants took retaliatory action against Plaintiff after and because he individually and collectively engaged in lawful exercise of generally guaranteed First

1       Defendants argue that a counseling chrono is not an adverse action, therefore any

2   action following cannot be considered retaliation.  In addition, they argue Plaintiff does not

3   allege protected activity as inmates are not allowed to freely converse with others.  Finally,

4   defendant Kaiser sets forth a legitimate penological purpose for the chronos Plaintiff was issued,

5   that allowing inmates to freely converse with other visitors risks the safety and security of the

6   institution.  To allow such behavior could facilitate escape plans, inmate violence or other illicit

7   activity.

8       Even assuming for a the moment that the chronos Plaintiff was issued would be

9   considered adverse action, Plaintiff has not adequately identified any protected activity he was

10  engaged in.  While inmates certainly retain some right to peaceably assemble, as he has set forth

11  in his argument, he has not provided any authority nor has the court found any which indicate

12  that inmates have an unfettered right under the First Amendment to visit with any and all persons

13  in the visiting room.  To the contrary, the Supreme Court has held that "freedom of association is

14  among the rights least compatible with incarceration, [and] some curtailment of that freedom

15  must be expected in the prison context."  Overton v. Bazzetta, 539 U.S. 126, 131 (2003)

16  (citations omitted).  Defendants have provided evidence indicating valid reasons why visits are

17  limited to those visitors authorized for each inmate.  Specifically, Defendants have indicated such

18  restrictions are necessary for safety of the institution.

19      In addition, Plaintiff acknowledges that he was not cleanly shaven for a surprise

20  visit he received.  While he argues he was not in violation of the then enforced grooming

21  standards necessitating a clean shave, he has admitted he was not cleanly shaven.  He fails to

22  provide any evidence that this report was in fact falsified.  In addition, he similarly fails to

23  _____

24  Amendment rights toward, against, and otherwise concerning and involving the CDCR, CDCR
    personnel, MCSP, and related matters of public concern" is insufficient.  (See Pl. Response, Doc.
25  209 at 63-4).  Plaintiff makes other equally inadequate arguments about his "associates"
    engaging in other First Amendment rights, such as making statements adverse to CDCR.
26  However, those arguments do not relate to Plaintiff's activities, and are just as conclusory.

1   establish any protected activity he was engaged in prior to receiving the write up.

2          Therefore, the undersigned finds Defendants have provided sufficient evidence to

3   place the burden on Plaintiff to show he was in fact involved in a protected activity and the

4   adverse action was not reasonably related to a penological concern.  Plaintiff fails to meet that

5   burden, and summary judgment on this claim is appropriate.

6          **3.      Claim 5**

7                  The defendants named in the Supporting Allegations (Counts)
           below then deprived Plaintiff further of secured rights, privileges, and
8          immunities by causing the campaign of retaliatory oppression alleged
           above at Claims 1-4 to continue being perpetrated against him as follows
9          in direct relation to him and his associates documenting, reporting,
           publicizing through UNION's Internet web site (1union1.com), and
10         otherwise petitioning for redress of the unlawful events, circumstances,
           and conditions alleged in Claims 104 above and in the Supporting
11         Allegations (Counts) below which occurred after and because Plaintiff
           lawfully expressed himself in confidential mail prepared and sent
12         following the East Coast terrorist attacks of 9/11/01.
           5a:    From 9/22/01 to 9/26/01, . . . WARREN . . . caused Plaintiff to
13                suffer retaliatory & otherwise illegal confinement in ad-seg under
                  false pretenses without written notice of why as Due Process
14                requires.
           5c:    Upon Plaintiff's release from ad-seg on 9/26/01, C.D. BROWN . . .
15                caused a perjured document to be placed in Plaintiff's permanent
                  record to inaccurately reflect false justification for his above
16                confinement in ad-seg.

17         Here, Plaintiff contends he was confined in administrative segregation

18  improperly.[15]  It is unclear from Plaintiff's complaint what protected activity Plaintiff claims he

19  was involved in resulting in the adverse action of confinement in administrative segregation, but

20  appears to relate to what he classifies as "confidential" correspondence.

21         The undisputed evidence shows that Plaintiff sent a letter to the CIA which

22  indicated a possible threat of suicide.  Upon receipt of information that Plaintiff may intend to

23  take his own life, he was taken to the infirmary and referred for evaluation.  Once medical staff

24  determined he did not pose an immediate threat to himself, he was placed in administrative

25  _____

26         [15]     As stated above, the only claims remaining in this action relate to Plaintiff's claim
    of retaliation.

1   segregation.  Defendant Warren's only involvement in this situation was an administrative

2   review two days after Plaintiff's placement; defendant Brown's involvement was as an ICC

3   member reviewing his placement.[16]

4           Plaintiff's retaliation claim is unclear in relation to these events.  Plaintiff's

5   conclusory and general allegations about being involved in protected activity, are not specific

6   allegations as to what protected activity he was involved in resulting in his placement in

7   administrative segregation.  To the extent writing a letter to the CIA was the protected activity he

8   alleges he was engaged in, he appears to be claiming this letter was confidential and prison

9   officials had no right to receive information from or about it.  Prisoners do have a First

10  Amendment right to send and receive mail.  See Witherow v. Paff, 52 F.3d 264, 265 (9th Cir.

11  1995) (per curiam).  However, prison officials may intercept and censor outgoing mail

12  concerning escape plans, proposed criminal activity, or encoded messages.  See Procunier v.

13  Martinez, 416 U.S. 396, 413 (1974); see also Witherow, 52 F.3d at 266.  Plaintiff's letter to the

14  CIA sets forth his feelings related to the events of September 11, 2000, and his desire to serve his

15  country.  There is nothing in the letter which could be construed as criticism of any prison or

16  prison official.  To the extent Plaintiff believes this was a confidential letter, and the defendants

17  somehow inappropriately intercepted the letter, Plaintiff provides no evidence to support that

18  allegation.  Defendants have offered evidence, by way of declaration, that information regarding

19  Plaintiff's possible suicidal ideation came from the CIA, not through the inappropriate

20  interception of the letter.  In addition, with a possible exception for legal mail, outgoing

21  correspondence can be reviewed by prison officials.  Therefore, even if the letter was read by

22  prison officials, there would be no First Amendment violation, and Plaintiff has not offered any

23  evidence to the contrary, as it appears that the CIA actually received his letter.  Even if such a

24  ───────────────

25  [16]   In fact, Plaintiff specifically states that his claim against defendant Brown only
    relates to a claim for a fraudulent CDC 128-G, not retaliation.  As all claims except retaliation
    have been dismissed, Plaintiff's assertion essentially indicates there are no remaining claims

26  against defendant Brown.

1   letter could be construed as a protected activity, Plaintiff has acknowledged that neither

2   defendant named in this claim were involved in the alleged adverse action, his placement in

3   administrative segregation.[17]  The only involvement defendants Warren and Brown had in this

4   incident was reviewing Plaintiff's placement.  In reviewing Plaintiff's placement, defendant

5   Warren decided to retain him in administrative segregation until the placement could be reviewed

6   by the ICC committee. Defendant Brown was part of the ICC committee who reviewed the

7   placement and decided to release Plaintiff from administrative segregation.  Plaintiff fails to

8   produce any evidence of retaliatory motive, thus he fails to meet his burden.

9          Accordingly, the undersigned finds summary judgment to be appropriate in favor

10  of defendants Brown and Warren on this claim.

11         **4.      Claim 7**

12         The defendants named in the Supporting Allegations (Counts)
       below then deprived Plaintiff and his associates further of secured rights,

13     privileges, and immunities by causing the campaign of retaliatory
       oppression alleged above at Claims 1-6 to continue being perpetrated

14     against them as follows in direct relation to their documenting, reporting,
       publicizing through UNION's Internet web site (1union1.com), and

15     otherwise petitioning for redress of the unlawful events, circumstances,
       and conditions alleged in Claims 1-6 above and in the Supporting

16     Allegations (Counts) below which occurred after and because Plaintiff on
       10/28/01 and 10/30/01 posted lawful information on a bulletin board

17     specifically provided and designed for all prisoners to use with unimpeded
       direct access.

18     7a:    On 10/29/01 and 10/31/01, . . . HOGAN, . . . WARREN, . . .
              jointly caused the lawful information to be arbitrarily and

19            capriciously confiscated for no legitimate reason which served a
              valid penological objective.

20

21

22     [17]    Indeed, a review of Plaintiff's journal entries submitted in support of his claims,
       fail to indicate any participation of defendants Warren or Brown in the decision to place him in

23     administrative segregation.  Plaintiff's argument seems to be that Warren failed to use her power
       and authority to remove him from administrative segregation because he did not meet the criteria

24     for housing in administrative segregation.  However, it is clear that Warren did not take part in
       the decision to place Plaintiff in administrative segregation. To the extent Plaintiff is claiming

25     violation of policy for placing him in administrative segregation, it is clear that defendant Warren
       did not make that decision.  Defendant Warren's only involvement in this situation was to decide

26     to have the ICC determine whether to release Plaintiff or continue his confinement in
       administrative segregation.

1    Here, Plaintiff is claiming he placed a document on a bulletin board which was

2    removed.  Defendants argue Plaintiff was not engaged in any protected activity, suffered no

3    adverse action, and their actions had a legitimate penological purpose.  Plaintiff argues the

4    bulletin board he used was open to all prisoners to post documents on, and the defendants had no

5    right to remove it.

6    The undisputed evidence shows Plaintiff posted personal documents on the

7    facility bulletin board without approval by facility.  These documents were removed by defendant

8    Hogan upon defendant Warren's orders.

9    Plaintiff claims he had a First Amendment right to post what ever documents he

10   wanted on the inmate bulletin board, and they were arbitrarily and capriciously singled out to be

11   removed.

12   First, Plaintiff's claim of protected activity is unclear.  He appears to be arguing

13   again that he has an unfettered First Amendment right to freedom of expression.  As discussed

14   above, prisoners do not retain unfettered First Amendment rights, and those they retain may be

15   limited for legitimate penological concerns.  Allowing inmates to post anything and everything

16   they wish on a bulletin board could be a serious security risk.  Therefore, limiting what can be

17   posted, even on an inmate bulletin board, serves a legitimate penological purpose.  In so doing,

18   the institution has developed policies that inmates must obtain the approval of prison officials

19   prior to posting anything on the bulletin board.  In this case, Plaintiff acknowledges he did not

20   have prior permission.

21   In addition, it is unclear what, if any, adverse action Plaintiff was subjected to.

22   There is no indication that he received any chronos or any other disciplinary proceedings.  All

23   that occurred was the removal of Plaintiff's personal documents from the bulletin board.

24   Therefore, he fails to meet the first criteria showing retaliation.  In addition, defendants have

25   provided evidence that the policy serves a legitimate penological purpose.  Plaintiff fails to

26   counter that evidence.  To the extent he alleges his documents were signaled out and the only

1   ones removed, that is insufficient to show it was removed in retaliation.  He has provided no

2   evidence that other prisoners were allowed to post unapproved documents on the bulletin board.

3   Even if his argument was sufficient to show his documents were singled out for removal,

4   removal of documents cannot be considered an adverse action in this situation.  There is nothing

5   about removing documents from a bulletin board which could be construed as threatening, or

6   damaging in any manner.  Providing prison officials with the proper deference for prison

7   management, the undersigned finds no evidence of adverse action, and that the defendants'

8   actions were reasonably advancing a legitimate correctional goal of controlling the publication or

9   distribution of information between inmates.

10          Accordingly, the undersigned finds it appropriate to enter summary judgment on

11  this claim in favor of defendants Warren and Hogan.

12          **5.      Claim 8**

13          The defendants named in the Supporting Allegations (Counts)
     below then deprived Plaintiff and his associates further of secured rights,
14   privileges, and immunities by causing the campaign of retaliatory
     oppression alleged above at Claims 1-7 to not merely continue being
15   perpetrated against them but rather escalate and intensify as follows in
     direct relation to their documenting, reporting, publicizing through
16   UNION's Internet web site (1union1.com), and otherwise petitioning for
     redress of the unlawful events, circumstances, and conditions alleged in
17   Claims 1-7 above and in the Supporting Allegations (Counts) below which
     occurred after and because Plaintiff exercised his protected rights in: (a)
18   correspondence on 12/6/01 . . . stating that an investigation should be
     conducted into "the oppressive reign of Mike Knowles" at MCSP: (b)
19   filing suit on 1/16/02 against KAISER, KING . . . and WARREN for their
     roles in his retaliatory and otherwise unlawful confinements in ad-seg on
20   9/22/00 and 9/22/01 (see above, Counts . . . 5a. . . ; and (c) mailing on
     3/11/02 . . . a letter and 20-page compilation of grievances reflecting
21   mismanagement by Knowles and other officials over MCSP.
     8a:      On 5/29/02, a week after the U.S. Marshal served Plaintiff's
22            1/16/02 civil . . .  complaint on KAISER, . . . & WARREN,
              Plaintiff had to file a grievance against . . . SMITH for being jointly
23            caused . . . to falsely tell Plaintiff that he was suddenly required to
              automatically have his i.d. card out of his pocket and in hand every
24            day to enter the dining facility for meals irrespective of whether
              any guard(s) first asked to see it as procedurally required under
25            state law.
     8b:      On 5/30/02, . . . SMITH . . . caused Plaintiff to suffer being locked
26            by . . . SMITH in a narrow cage for no valid reason and made to eat

1                                dinner there standing up before finally getting released an hour
                               later.

2      8c:       On 5/31/02, Plaintiff filed another grievance asking that . . .
SMITH, & other MCSP staff stop oppressing him in violation of

3                      state law, but after SMITH menacingly said to him upon receiving
the grievance: "Okay, you want to play? we can play," . . .

4                      GUTIERREZ, . . . SMITH, . . . committed obstruction of justice by
jointly causing review of the matter to be illegally impeded and

5                      otherwise conducted in violation of Plaintiff's guaranteed
grievance rights.

6      8h:       Beginning 9/6/02, . . . GUTIERREZ, . . . LATTIMORE, POE . . .
jointly caused Plaintiff to suffer retaliatory and false disciplinary

7                      action which deprived him of rights & liberty without Due Process
& Equal Protection merely because he had freely expressed himself

8                      to POE from behind the solid metal door of his locked cell.

9             This claim contains separate and distinct events, which are analyzed separately.

10 The first set relate to events which occurred in May 2002.  The second relates to events which

11 occurred in September 2002.

12             In May 2002, Plaintiff claims a separate civil rights action was served on

13 defendants Kaiser and Warren, in addition to other individuals not a party to this action.  A week

14 after service was complete, defendant Smith retaliated against him by requiring him to show his

15 identification card to enter the dining hall, locked Plaintiff in a cage and made him eat dinner

16 there standing up, and defendants Smith and Gutierrez impeded his grievance rights.[18]  Petitioner

17 claims these actions were motivated by the prior lawsuit and correspondence outlining

18 mismanagement of prison officials.

19             The undisputed evidence shows that prison policy requires inmates to carry on

20 their person an identification and privilege card, and are required to surrender the identification

21 card at the request of any employee.  Officer Ellis was the one who placed Plaintiff in the holding

22 cage and Sergeant Murray was the one who made him eat standing up in the holding cage.

23 Neither defendant Gutierrez nor Smith were involved in the screening out of Plaintiff's inmate

24

25          [18]     Plaintiff confirmed that these claim are against defendants Smith and Gutierrez
only, not against defendants Kaiser, King or Warren.  (See Pl. Response to DUF #56, Doc. 210,

26 at 16).

appeal, but rather it was screened out by E.A. Reyes as a duplicate appeal.  In addition, neither defendant Gutierrez nor Smith were aware of any letter Plaintiff wrote nor of his prior litigation against other defendants.

Plaintiff argues that in addition to his lawsuit and grievances, he was known for vigorous advocacy of prisoner rights, and therefore was subjected to harassment and retaliation, such as those set forth in this claim.  Plaintiff has acknowledged that defendants Gutierrez and Smith likely had no knowledge of his lawsuit against other prison officials, and that they were not personally involved in the screening out of his inmate appeal.  While he argues this claim is more than just the screening out of the appeal, he does not articulate how defendants Gutierrez and Smith otherwise impeded his grievances.

As to other protected activity, Plaintiff again fails to set forth any specific activity he was involved in which would be considered protected activity, and his general statements about advocating for prisoner rights is insufficient.  Plaintiff also fails to show how following a procedure, such as requiring ID cards to be displayed, which is supported by prison policy, is an adverse action which is not reasonably related to advancing a legitimate correctional goal, such as properly identifying all inmates in the dining hall for security purposes.  Nowhere in Plaintiff's argument does he articulate that he and he alone was required to show proper identification.  In fact, in Plaintiff's journal entry for June 8, 2002, he specifically references another inmate's action automatically showing the officers his identification card without being asked.  (See Pl. Ex. B at 420).  Nor has he argued that he was denied access to the dining hall or denied food.  While perhaps a slight nuisance, especially if he was as well known to the correctional officers as he indicates, requiring Plaintiff to produce his identification card every time he entered the dining hall does not rise to the level of an adverse action.

Similarly, Plaintiff acknowledged that it was Ellis who placed him in the holding cell and Murray made him eat in the holding cell.  He argues defendant Smith "caused" these actions by his identification card requirement, and did not intervene to stop them.  However, such

allegations are insufficient to support a claim.  There must be some personal involvement in the alleged actions in order for a prison official to be liable for any alleged constitutional violation. Failure to stop another's actions is generally insufficient.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Indeed, Plaintiff's journal entry for May 30, 2002, which he submitted as support for his claim, specifically states that Murray ordered Ellis to take Plaintiff to the holding cage and have him eat dinner there.  (See Pl. Ex. B at 414).  While defendant Smith may have required Plaintiff to show his identification card, there is no support for his claim that defendant Smith had anything to do with his placement in the holding cage.  Finally, Plaintiff's claim relating to the interference with his inmate grievance is unclear.  Plaintiff specifically states Claim 8c has "nothing to do with any mere 'screen out' of Plaintiff's grievance." (Doc. 210 at 19).  However, if that is not the basis of his claim, it is unclear what the basis of his claim is.  Plaintiff's journal entries identified as supporting this claim document meetings he had with defendants Smith and Gutierrez, but fail to support his claim that they somehow obstructed justice or impeded the grievance process by meeting with him in an attempt to informally resolve the conflict.

Therefore, the undersigned finds Plaintiff's retaliation claims against defendants Gutierrez and Smith are insufficient in that he fails to identify his protected activity, and fails to set forth an adverse action in response thereto.  Accordingly, summary judgment is appropriate.

In September 2002, Plaintiff claims he suffered retaliatory and false disciplinary action after freely expressing himself to defendant Poe.  Apparently, following the regularly scheduled count of inmates on September 6, 2002, a second emergency count took place.  This second count delayed Plaintiff's visiting.  During this second count, Plaintiff had a verbal exchange with defendant Poe.  Following the verbal exchange, Plaintiff received an RVR 115 for disruptive behavior.

/ / /

/ / /

/ / /

1    The undisputed facts show Plaintiff was found guilty of disruptive behavior

2 during an emergency count.[19]

3    Plaintiff's claim appears to be that he was exercising his First Amendment

4 freedom of speech rights during the verbal exchange with defendant Poe.  Plaintiff's journal

5 entry indicates that the verbal exchange with defendant Poe included the use of profanity.  (See

6 Pl. Ex. B at 451).  Plaintiff appears to contend that instead of a serious disciplinary proceeding,

7 defendant Poe should have given him a warning or at most a counseling chrono.  He also

8 indicates that he was not aware it was an emergency count, rather than a mere miscount by the

9 guards.

10    Defendants argue Plaintiff's activity was not protected First Amendment free

11 speech because it was disruptive behavior during an emergency count, which causes a security

12 and safety risk.  During an emergency count, wherein the prison officials are concerned about a

13 possible escape, disruptive behavior is serious thus warranting a serious disciplinary proceeding.

14    As stated above, prisoners do not retain unfettered First Amendment free speech

15 rights during imprisonment.  Where such activity necessarily conflicts with institutional safety

16 and security, a prisoner's free speech may be impinged.  Here, even if Plaintiff adequately

17 alleged an adverse action because of a protected activity, he must still show that the adverse

18 action was not reasonably related to a legitimate correctional goal.  Defendants submit that the

19 response to Plaintiff's verbal confrontation with defendant Poe was reasonably related to a

20 legitimate correctional goal, security and safety of the institution. That Plaintiff's actions posed

21 such a threat as potentially delaying an emergency count when a possible escape has occurred,

22 and prison official must act quickly to discover if such an event had occurred.   Nothing in

23 Plaintiff's evidence or argument supports his theory that the disciplinary action was motivated by

24 retaliation rather than the safety and security of the institution.  Although he argues that the

25

26    [19]    Plaintiff agrees this is an undisputed fact, but denies he was truly guilty of the
disruptive behavior charge.

disciplinary proceedings were excessive where a verbal warning or counseling chrono would have been sufficient, he fails to meet his burden in showing the defendants were motivated by retaliation rather than institutional security.  Had Plaintiff's verbal confrontation with defendant Poe not occurred during an emergency count, Plaintiff may have a better position.  However, the incident did occur during an emergency count, and giving proper deference to prison officials in such a situation, the defendants' response thereto was reasonably related to institutional security.

The undersigned finds Defendants have met their burden of showing their actions were reasonably related to advancing a legitimate correctional goal, and Plaintiff fails to show otherwise.  Accordingly, Defendants motion for summary judgment should be granted.

**6.      Claim 9**

The defendants named in the Supporting Allegations (Counts) below then deprived Plaintiff and his associates further of secured rights, privileges, and immunities by causing the campaign of retaliatory oppression alleged above at Claims 1-8 to continue being perpetrated against them as follows in direct relation to their documenting, reporting, publicizing though UNION's Internet web site (1union1.com), and otherwise petitioning for redress of the unlawful events, circumstances, and conditions alleged in Claims 1-8 above and in the Supporting Allegations (Counts) below which occurred after and because Plaintiff and his  prisoner associates petitioned for redress of their food being repeatedly defiled by other prisoners.

9b:      On 1/7/03, 1/11/03 & 1/15/03, ETHEREDGE, . . . GUTIERREZ . . . caused Plaintiff and his prisoner associates to be served food which prisoners on MCSP's "C" facility had contaminated with what was reported, identified, &/or said to be, respectively, "pubic hairs" & at least one rock-like object, fragmented razor blades, & at least one hook-shaped length of wire embedded within bite-size meat.

9c:      On 1/11/03, . . . GUTIERREZ . . . caused several MAC members (see above, Claims 4 & 6) to be unlawfully threatened by GUTIERREZ with retaliatory disciplinary action and confinement in ad-seg for lawfully alerting their prisoner constituents entering the dining area to the razor blade fragments just discovered in that evening's dinner entree.

Here, Plaintiff's retaliation claims are again unclear.  To the extent Plaintiff is claiming defendant Gutierrez threatened MAC members with disciplinary action, he has been denied third party standing to raise issues related to other prisoners.  In support of his claims,

Plaintiff again submitted his journal entries.  In his journal entry for January 11, 2003, the day Plaintiff alleges defendant Gutierrez made threats, he states that he heard of the threats from MAC members, not that Gutierrez made the threats directly to Plaintiff.  (Pl. Ex B at 558).  There is nothing to support an interpretation of this claim that defendant Gutierrez threatened Plaintiff. Therefore, Claim 9 does not appear to include any retaliation claim.

In addition, as discussed below, defendants argue that the investigation into the alleged food contamination determined that it was Plaintiff and another inmate who were contaminating the food, and trying to incite other prisoners to revolt in order to transfer the food preparation duties to Facility B instead of Facility C where the kitchen facilities were.  Therefore, any threat or actual disciplinary action was based on a legitimate penological goal, and Plaintiff was not actually engaged in protected activity.  In support of this argument, defendants submit the investigation report, including the confidential statement reports, and Plaintiff's disciplinary proceedings wherein he was found guilty of the conspiracy to contaminate the food.  Plaintiff contends that the investigation and report resulting therefrom were falsified.  However, he fails to support these contentions with any evidence, such as a decision overturing the guilty disposition.

Therefore, the undersigned finds no retaliation claim remains in Claim 9.  Even if one could be construed therein, Defendants provide evidence supporting their contention that the response to the contaminated food was a legitimate penological goal, and Plaintiff fails to provide any evidence to the contrary.  Accordingly, defendant's summary judgment motion should be granted as to Claim 9.

**7.    Claim 10**

The defendants named in the Supporting Allegations (Counts) below then deprived Plaintiff and his associates further of secured rights, privileges, and immunities by causing the campaign of retaliatory oppression alleged above at Claims 1-9 to not merely continue being perpetrated against them but rather escalate and intensify as follows in direct relation to their documenting, reporting, publicizing though UNION's Internet web site (1union1.com), and otherwise petitioning for redress of the unlawful events, circumstances, and conditions alleged in Claims 1-9 above and in the Supporting Allegations (Counts) below which

1    occurred after and because Plaintiff and his associates documented,
     reported, publicized through UNION, and otherwise grieved the recent
2    food contaminations and related deliberate indifference, endangerment,
     and retaliatory acts alleged above at Claim 9.
3    10d:   Beginning 2/1/03, . . . GUTIERREZ, HEIN, . . . HOGAN, . . .
            KEELAND . . . jointly caused Plaintiff to suffer retaliatory &
4           otherwise unlawful frequent cell searches, seizure of his only
            jacket, and cruel exposure to 9 consecutive days and nights of cold
5           and wet winter weather without the extra protective clothing all
            CDCR prisoner are guaranteed under state law.
6    10e:   When Plaintiff tried to petition for redress of the retaliatory cell
            searches above and seizure of his only jacket, . . . GUTIERREZ, . .
7           . HEIN, . . . LATTIMORE, . . . WARREN . . . committed
            obstruction of justice by jointly causing review of the matter to be
8           illegally impeded and otherwise conducted in violation of
            Plaintiff's guaranteed grievance rights.
9    10f:   From 2/10/03 to 5/8/03, . . . ETHEREDGE, . . . GUTIERREZ, . . .
            KAISER, . . . LATTIMORE, . . . SAUCEDA, . . . WARREN, . . .
10          jointly caused Plaintiff to suffer retaliatory & otherwise unlawful
            confinement in ad-seg under false pretenses sans adequate Due
11          Process and Equal Protection in direct relation to him and his
            associates publicizing the food contaminations of 1/7/03, 1/11/03,
12          & 1/15/03 (see above, Count 9b) and the subsequent retaliations
            against him and his prisoner associates alleged at Counts 9c-9f.
13   10g:   In relation to Plaintiff's above confinement in ad-seg on 2/10/03 . .
            . DANZI[N]GER, . . . ETHEREDGE, . . . GUTIERREZ, . . .
14          KAISER, . . . LATTIMORE, . . . SAUCEDA, . . . WARREN,
            jointly caused him to suffer: (i) severe mental trauma which
15          shocked him into a dissociative state of catatonia upon being
            subjected to the humiliating degradation of having to contort and
16          expose his nakedness to staff amidst so much retaliation since
            1/7/03; (ii) being unlawfully shackled while unconscious; (iii)
17          having all personal clothing he was wearing at the time ripped or
            cut off his body, lost, &/or otherwise destroyed; (iv) being robbed
18          of dignity by having his naked & unconscious body crudely and
            disrespectfully photographed, videotaped, & otherwise displayed to
19          other prisoners and female staff; & (v) being dumped face-down
            and left alone on a bare & cold concrete floor of an ad-seg cell with
20          no mattress or bedding under him.
     10h:   After Plaintiff then tried to commit suicide while in the above
21          dissociative mental state on 2/10/03, . . . DANZI[N]GER . . .
            caused him to unlawfully remain in the ad-seg unit and, over the
22          next few days while left naked and helpless, suffer being: (i)
            dogpiled several times by squads of helmeted & padded guards
23          wielding shields, pepper spray, and truncheons; (ii) dragged face-
            down by his ankles across bare concrete floors; (ii) left laying for
24          many hours in pool s of his urine; (iv) purposely left propped for
            hours in unnatural positions against cold exterior walls and on bare
25          concrete floors with no mattress or bedding under him; (v) put in
            5-point restraints; (vi) involuntarily experimented on with injected
26          and orally given drugs not indicated for his then-present medical

                                    38

condition; (vii) confined in bare ad-seg cells with only cold concrete to sit and sleep on; & (viii) made to sign documents he could neither read nor comprehend due to the stupefying effects of the aforementioned illegal drugging.

10i:   On 2/17/03, DANZI[N]GER, . . . KAISER, . . . jointly caused Plaintiff to suffer being psychologically tormented over an 8-hour period of time from just outside his cell door by KAISER, among other things, loudly talking bad about him and his mother to someone on the phone and then maliciously leaving 3 bright fluorescent cell lights glaring directly down on him all night, thus causing him great discomfort all night due to extreme photosensitivity caused by the above drugging.

10m:   Beginning 2/20/03, ETHEREDGE, . . . GUTIERREZ, . . . HOGAN, . . . LATTIMORE, POE, . . . WARREN . . . jointly caused Plaintiff and MAC Vice Chairman Bristow (see above, Counts 9f &10c) to suffer retaliatory & false disciplinary action which deprived them of rights and liberty without adequate Due Process and Equal Protection in direct retaliation to their having documented, reported, and otherwise grieved not only the previously discussed food contamination of 1/7/03, 1/11/03, & 1/15/03, but also the related retaliation they and their prisoner associates had suffered as a result.

10o:   During the "investigation" supposedly conducted on Plaintiff's behalf by an assigned guard, ETHEREDGE, . . . GUTIERREZ, . . . HOGAN, . . . LATTIMORE, POE, . . . WARREN, .. . . jointly caused Plaintiff's requested prisoner witnesses to be threatened, intimidated, & otherwise prevented from answering discovery questions asked by Plaintiff through the assigned guard.

10q:   Beginning 2/27/03, after Plaintiff was caused for at least 2 weeks to suffer the excruciatingly uncomfortable side effects of the above illegal drugging which began around 2/11/03, . . . DANZI[N]GER . . . caused Plaintiff to also suffer blindingly severe withdrawal pains while his pleas for aspirin, Tylenol, &/or a doctor were denied . . . on 3/1/03 & 3/4/03 (accompanied by threats to "throw your ass back in 5-point restraints" and to "shoot you full of dope") and then by DANZI[N]GER after and because Plaintiff caused him to lose for MCSP on 3/10/03 a petition before the California Office of Administrative Hearings to continue medicating Plaintiff against his will.

10r:   Beginning 2/28/03, . . . ETHEREDGE, . . . GUTIERREZ, . . . LATTIMORE, . . . WARREN . . . caused Plaintiff to suffer retaliatory and false disciplinary action which deprived him of rights, liberty, and property without adequate Due Process and Equal Protection in direct relation to Plaintiff lawfully obtaining free services as a bona fide indigent prisoner coincidental to Plaintiff's fiancee and their mutual friend the MAC secretary (prisoner Rocci Catanzarite) lawfully associating as correspondents.

10s:   When Plaintiff tried to petition for redress of the retaliatory and otherwise unlawful disciplinary action above, . . . LATTIMORE . . . committed obstruction of justice by jointly causing review of the

39

1   matter to be illegally impeded and otherwise conducted in violation
    of Plaintiff's guaranteed grievance rights.

2   10w:   Throughout Plaintiff's retaliatory confinement in ad-seg from
           2/10/03 to 4/29/03, . . . KANIPE . . . caused Plaintiff's many
3          request for access to his stored legal property to be unlawfully
           ignored &/or otherwise denied.

4   10x:   On 4/29/03, ETHEREDGE, . . . GUTIERREZ, . . . LATTIMORE, .
           . . WARREN . . . caused Plaintiff to suffer retaliatory transfer to a
5          higher-security prison where he was put in ad-seg for 9 days and
           then deprived of several expensive items of personal property
6          allowed at MCSP, as well as many of the liberties and privileges he
           had earned his first several years in prison before being transferred
7          to MCSP in 1999 to facilitate his mental condition & prescribed
           needs as previously stated at ¶ 1 of this Section E.

8

9        Here Plaintiff argues that he suffered from several retaliatory acts because he

10   reported contaminated food.  As mentioned above, the defendants completed an investigation in

11   to the alleged food contamination and determined it was Plaintiff and another inmate who

12   conspired together to contaminate the food in an attempt to have the food preparation

13   responsibilities transferred from Facility C to Facility B.  While Plaintiff contends this

14   investigation was falsified, he has not provided any support for that position.  Defendants,

15   however, have provided the investigation and hearing documentation which support the findings.

16   (See Def. Ex. A at 111-39).

17        However, to the extent there are retaliatory claims raised in Claim 10, the

18   undersigned will address the sub-claims separately.  Plaintiff's claims break down into several

19   categories:  cell search; impeding grievances; placement in administrative segregation; false

20   disciplinary actions; treatment while in administrative segregation; and transfer.

21        Claim 10d-e:  Here, Plaintiff alleges he suffered retaliatory cell searches,

22   confiscation of his winter jacket, and impediments to grieving these wrongs.  Plaintiff does not

23   allege involvement in any specific protected activity, but makes general allegations related to

24   grievances of the food contamination, presumably the grievances he filed complaining about

25   food contamination prior to the charges being filed against him as the perpetrator.  Defendants

26   argue Plaintiff was not engaged in any protected activity, and he has no reasonable expectation of

40

1    privacy or possession of specific clothing.

2             While Plaintiff alleges retaliatory cell searches, having his cell searched three

3    times in a 20 day period of time, he fails to support his claim of retaliation.  Clearly, prisoners are

4    subject to random cell searches and have no reasonable expectation of privacy in their cell.  See

5    Hudson v. Palmer, 486 U.S. 517, 528-29 (1984).  Plaintiff's argument related to the cell searches

6    appears to be more concerned with the confiscation of the winter jacket rather than anything

7    related to the actual search itself.  In that regard, the undisputed facts establish that the jacket

8    which was confiscated during a cell search was a prison issued jacket designed for yard crew

9    inmates.  Indeed, Plaintiff acknowledges he was issued the jacket in November 2001, while

10   assigned to the yard crew.  He also acknowledges that he was no longer assigned to the yard crew

11   in February 2003.  As such, he had no right to the jacket, and removing it from his cell cannot be

12   seen as an adverse action.[20]  As Plaintiff fails to articulate a specific protected activity, and there

13   was no adverse action, Plaintiff's claim for retaliatory cell searches must fail.

14             Plaintiff's related claim, that his resulting inmate grievance was obstructed,

15   similarly fails.  Plaintiff clarifies that his claim in 10e "is against Hein and Lattimore for their

16   role in personally causing and/or allowing the review of his grievances to be unlawfully impeded

17   . . . ." (Doc. 210 at 32).  However, this does not clarify his claim of retaliation.  Plaintiff fails to

18   explain how the defendants obstructed his ability to file an inmate grievance, and how those

19   actions (assuming such action would be adverse) were in retaliation for some protected activity.

20   Certainly filing an inmate grievance is a protected activity, and retaliating against an inmate for

21   doing so could be retaliation.  However, here Plaintiff did file an inmate grievance which was

22   addressed and denied.  Plaintiff apparently filed another inmate grievance which was denied at

23   the informal level, and screened out thereafter for failure to adequately complete the inmate

24

25

26       [20]       Plaintiff's claim seems to be more related to the issue of failure to provide
     appropriate winter clothing.  However, that is not the issue in this action.

appeal form.  (See Def. Ex. A 142-46). [21]  The screening form indicates Hansen was the prison

official to screen out the second appeal, not one of the remaining defendants.  Plaintiff similarly

contends prison officials failed to followed the proper procedures in regards to his first petition.

However, the evidence submitted shows that while defendant Lattimore was one of the reviewing

officials who denied Plaintiff's first inmate appeal, defendant Hein was not involved in any of

the appeals and Plaintiff has not submitted any evidence that either defendant Hein or Lattimore

was involved in the screening out of his second appeal.[22]  Therefore, Plaintiff's claim against

defendants Hein and Lattimore is unclear and unsupported.  Accordingly, the undersigned finds it

appropriate to enter summary judgment for these defendants.

Claim 10f:  Here, Plaintiff alleges his confinement in administrative segregation

during the investigation into the food contamination issue was without proper Due Process and in

retaliation.  Again, Plaintiff fails to articulate a protected activity.  To the extent he claims

informing other inmates of the food contamination issue was a protected activity, if such

statements were false and made with the intent to incite other prisoners, such statements are not

protected activity within a prison setting.  As defendants argue, allowing such false and inciting

statements would be a risk to prison security and safety.

Assuming for the moment that Plaintiff sufficiently alleged a protected activity,

and that placement in administrative segregation was an adverse action based on that activity, in

order for Plaintiff to prevail on this claim he must also show the adverse action was not

reasonably related to a legitimate correctional goal.  Here, defendants have submitted evidence

---

[21]     Plaintiff does not dispute these occurrences, but argues they were improperly screened out.

[22]     Plaintiff does argue that defendant Lattimore personally participated in refusing or otherwise failing to get the grievance back to Plaintiff for more than two months.  He does not, however, provide any evidence to support this claim.  The grievance forms Plaintiff submits fails to show any involvement of defendant Lattimore.  Only those provided by the defense show that defendant Lattimore was involved at all, and that involvement was limited to participation in the first level response.  (See Pl. Ex. B at 607-10, 691).

1  supporting the decision to place Plaintiff in administrative segregation based on the investigation

2  into the food contamination incident.  (See Def. Ex. A 140).  A review of the document indicates

3  that Lieutenant Klinefelter made the determination to place Plaintiff in administrative segregation

4  in order to protect the integrity of the investigation.  It appears this decision was reviewed by

5  several non-defendants.  Plaintiff's allegations against the named defendants are therefore

6  unsupported.  However, to the extent the named defendants were part of the investigation, and

7  therefore were somehow involved in the decision to place Plaintiff in administrative segregation,

8  the reason given for doing so was reasonably related to a legitimate penological goal.  The reason

9  given is supported by the investigation and hearing into the alleged food contamination incident,

10  finding Plaintiff was the perpetrator.  (See Def. Ex. A 111-39).  Therefore, defendants have met

11  their burden in showing a legitimate penological reason for their actions.  Plaintiff fails to

12  provide any support for his claim that the only reason was retaliation.  Granting defendants'

13  summary judgment is therefore appropriate.

14          Claim 10g-i:  Here, Plaintiff claims he was retaliated against while in

15  administrative segregation through the maltreatment by several defendants.[23]  Plaintiff makes

16  general allegations of mistreatment, such as having to expose his nakedness to staff, being

17  shackled while unconscious, having his clothing ripped off him, being photographed naked, and

18  being left on the bare concrete floor.  However, Plaintiff fails to allege who was responsible for

19  this maltreatment. The only specific allegations are that defendant Danzinger caused him to

20  remain in administrative segregation after he tried to commit suicide, and that defendant Kaiser

21  tormented him by loudly talking badly about him and his mother and leaving the lights on him all

22  night.

23

24          [23]      Plaintiff acknowledges defendants Etheredge, Gutierrez, Lattimore, Sauceda, and
        Warren had no influence or control over administrative segregation treatment.  (See Doc. 210 at
25      33).  Therefore, the only defendants remaining as to claims 10g-i are Danzinger and Kaiser.
        Plaintiff does not, however, specifically address these claims in his response to the motion for
26      summary judgment.

1    Defendants have submitted evidence in the form of declarations that none of the

2  named defendants, including Danzinger and Kaiser, were personally involved in the day to day

3  operations of the administrative segregation unit.  (See DUF #123).  While Plaintiff disputes this,

4  he fails to provide any evidence to support his claim.

5    Plaintiff fails to address this claim at all in his opposition to the motion.  In his

6  statement of disputed facts, he makes reference to defendant Danzinger holding the position of

7  ad-seg psychiatrist, but fails to provide any evidence that defendant Danzinger was personally

8  involved in the alleged mistreatment he suffered in his cell or had any participation in a decision

9  to keep him in administration segregation.  As to defendant Kaiser's personal involvement,

10  Plaintiff provides one journal entry wherein he states defendant Kaiser was working in ad-seg,

11  spoke negative about him, and left a light on.  However, even these allegations, read broadly, fail

12  to support his claim that she left the light on all night.  Plaintiff indicates defendant Kaiser came

13  on duty at 2:00 p.m.  She was there when dinner trays were served, and told him she would be

14  leaving his light on all night.  However, she was not on duty all night; Plaintiff indicates that

15  after shift change, his light was turned off.  Therefore, even if defendant Kaiser spoke negatively

16  about him and left his light on for the evening, the undersigned does not find such treatment to be

17  of a constitutional magnitude. (Pl. Ex. B at 638).  The other citations are not relevant.

18    Thus, the undersigned finds Defendants have met their burden of showing no

19  personal involvement, and Plaintiff fails to submit evidence to dispute that contention.  To the

20  extent Plaintiff supports his claim that defendant Kaiser spoke negatively about him and left his

21  light on, such claims are insufficient adverse treatment to support a retaliation claim.  Summary

22  judgement is therefore properly entered for Defendants.

23    Claim 10m,o:  Here, Plaintiff contends he suffered false disciplinary action

24  regarding the conspiracy to contaminate the food, and that the investigation therein was

25  interfered with by threatening and preventing witnesses from answering his questions.

26  Defendants contend that following the investigation and hearing, Plaintiff was found guilty, thus

any retaliation claim is defeated by that finding.  In addition, the investigation was thorough and complete, with no interference with the witnesses, and therefore no adverse action to support a retaliation claim.[24]  However, to the extent Plaintiff claims the "confidential" witness statements supporting the disciplinary action  were coerced, he again fails to provide any evidence to support this position.  While he makes reference to other inmates informing him that they gave false statements to the investigator based on fear of the officers, this "evidence" is contained in his journal entries and inmate appeals.  (See, i.e., Pl. Ex. B. at 586, 620, 645).  He does not provide any direct evidence such as declarations from the inmates themselves.[25]

        In relation to claim 10m, as defendants argue, Plaintiff's claim of retaliation is defeated by the finding that he was guilty of the charges.  Defendants have shown their actions were motivated by a legitimate penological interest, that of preserving safety, security, order and discipline in the institution.  The burden then shifts to Plaintiff to show a motivation other than a legitimate penological interest, which he fails to do.  Plaintiff provides no evidence supporting his argument that the charges were false, such as a court granting a habeas petition overturning the guilty finding.  Thus, the undersigned finds summary judgment is appropriate as to claim 10m.

        Similarly, as to claim 10o, the defendants have provided a copy of the complete investigation, including the questions and answers of Plaintiff's inmate witnesses, and statements that some potential witnesses were unwilling to testify.  Although there is evidence that some of Plaintiff's questions were not allowed, and some of the witnesses refused to cooperate, Plaintiff fails to meet his burden that the unwilling witnesses were motivated out of fear due to threats

---

[24]     Plaintiff again fails to address claim 10m in his opposition to the motion.  As to claim 10o, the citations to disputed facts are incorrect.  The citations he provides have to do with claim 10d only and are irrelevant to this claim.

[25]     At least not that the court has been successful in discovering.  If there are some declarations within the 1500 or so pages of documents Plaintiff submitted as "evidence" in support of his claims, the court was unable to locate them, nor does Plaintiff specifically reference any.

from the defendants.  As such, there is no showing that Plaintiff suffered from an adverse action

to support his retaliation claim, and summary judgment is again appropriate.

Claim 10q:  Here, Plaintiff claims defendant Danzinger made him suffer

uncomfortable side effects after removing him from involuntary medication.[26]  He argues

defendant Danzinger's actions were motivated by Plaintiff's success in petitioning for

termination of the involuntary medication order.

The undisputed facts show that Plaintiff was placed on involuntary medication in

February 2003.  He appealed that status in March 2003, and refused all psychotropic medication

thereafter.

In support of his claim, Plaintiff has submitted additional journal entries which

indicate that it was Plaintiff's choice to refuse the anti-psychotic medication.  (See Pl. Ex. B at

684).  According to the journal entries, the extent of defendant Danzinger's involvement appears

to be related to informing another doctor that Plaintiff should not have any side effects due to the

low dosage of medication.  (See Pl. Ex. B at 676).  However, even if Danzinger so informed the

other doctor, this does not support the allegation that he refused to provide Plaintiff medication

to control the side effects.  Rather, it appears it was Plaintiff's choice to stop the medication and

any side effects resulting therefrom.  There is nothing in Plaintiff's journal entries to indicate

defendant Danzinger refused to taper him off the involuntary medication, thereby avoiding any

potential side effects.  It also appears from Plaintiff's journal entries that defendant Danzinger

tried to inform Plaintiff that he was unable to prescribe pain medication.  The court also finds it

confusing that if Danzinger was unable to prescribe pain medication, why Plaintiff did not simply

make the same request to a medical doctor.  Indeed, Defendants have provided evidence that

Plaintiff met with Dr. Lipon wherein he agreed to taper off the medication, but then subsequently

---

[26]     It should be noted that the issue of involuntarily medicating Plaintiff is not an
issue in this action.  Only the failure to provide medication to help the withdrawal therefrom is
raised in Plaintiff's claims.

1   refused all medication.  However, regardless of whether or not defendant Danzinger was able to

2   prescribe pain medication, there is nothing in Plaintiff's argument or evidence to support his

3   claim that defendant Danzinger refused to prescribe pain medication in retaliation for Plaintiff

4   obtaining an order to stop the involuntary medication.

5          Claim 10r:  Here, Plaintiff claims the defendants filed false disciplinary

6   proceedings without adequate Due Process in retaliation for his lawfully obtaining free services

7   as an indigent prisoner.

8          The undisputed facts show that following an investigation, Plaintiff was charged

9   with misusing or unauthorized acquisition of state funds.  Following a hearing, he was found

10  guilty, but the offense was reduced to an administrative offense.[27]

11         Defendants again argue that Plaintiff's retaliation claim necessarily fails because

12  the charges were found to be true at the disciplinary hearing.  Again, Plaintiff fails to provide

13  evidence to support his claim that he is not guilty of the charges, such as proof the charges were

14  dismissed through the inmate appeals process or through a habeas petition.  Whether Plaintiff

15  was afforded the proper Due Process is not the issue in the case; the only issue is whether the

16  defendants brought the charges in retaliation.  In addition, it is unclear what Plaintiff's alleged

17  protected activity was.  To the extent he is claiming the retaliation was based on his fiancee's

18  freedom to associate with other prisoners, such activity cannot be the basis of his retaliation

19  claim as he was not personally involved in this allegedly protected activity.

20         Accordingly, the undersigned finds summary judgment to be appropriate.

21         Claim 10s:  Here, Plaintiff claims defendant Lattimore obstructed justice by

22  impeding his right to grieve the above disciplinary proceeding.

23

       [27]    While Plaintiff acknowledges these proceedings, he disputes his guilt.  The
24  charges related to an alleged scheme wherein Plaintiff's girlfriend allegedly sent money to a
   mutual friend who was also incarcerated, and the friend would then purchase canteen items for
25  Plaintiff.  The result of such a scheme would be that Plaintiff would benefit from the money
   provided for canteen items, but would not be required to pay for services such as a medical co-
26  pay, legal copies or payment on filing fees for his lawsuits.

1    The undisputed facts show that the disciplinary proceedings disposition reduced

2 the above offense to administrative.  As a result, Plaintiff's inmate grievance was exhausted at

3 the second level of review.

4    Defendants contend that because the disciplinary action was administrative, and

5 the second level review exhausted the inmate grievance, there was no adverse action and no

6 impediment to his grievance process.  Plaintiff does not dispute that his inmate appeal was

7 processed through the second level, nor that the second level exhausted the grievance process.

8 However, he claims the appeal was not handled by the proper authority.[28]  Specifically, he argues

9 that Correctional Counselor Hansen was allowed to participate in the grievance review even

10 though he is of lower rank than defendant Lattimore or Associate Warden Silva, and both of

11 them were personal participants in the events and circumstances.  Defendant Lattimore provides

12 a declaration that the inmate appeal was completed through exhaustion.

13    Plaintiff's fails to support his claim of retaliation.  First, Plaintiff's claim is

14 unclear in that it appears, and he does not contend otherwise, that the inmate appeal was

15 completed though exhaustion.  Therefore, regardless of who was the reviewing prison official,

16 the appeals process was completed, and his claim of obstruction is unclear.  Plaintiff's allegation

17 does not clarify how defendant Lattimore presumably obstructed the process.   In addition, given

18 that the grievance process was completed, Plaintiff fails to provide any argument or evidence to

19 counter defendant Lattimore's evidence that there was no adverse action.

20    Accordingly, the undersigned finds summary judgment of this claim is

21 appropriate.

22    Claim 10w:  Here, Plaintiff alleges that while he was confined in ad-seg,

23 defendant Kanipe refused his request for access to his legal property.

24 / / /

25 _____

26    [28]    Plaintiff again fails to address this claim in his opposition.  However, he does provide some argument in his dispute of the facts.

1    The undisputed evidence shows that during disciplinary detention in ad-seg,

2  inmates' legal resources are limited to pencil and paper.  Other legal material may be issued if the

3  inmate was involved in litigation which was in progress prior to placement in ad-seg and due

4  dates are imminent.  At the time he was in ad-seg, February 10, 2003 through April 29, 2003,

5  Plaintiff did not have any pending actions with imminent deadlines.

6    Defendant Kanipe contends Plaintiff had no legal right to his legal documents

7  while he was in ad-seg.  In addition, defendant Kanipe contends that he was not personally

8  involved in the handling of Plaintiff's access to his legal documents.  In support of this position,

9  Defendants submit a declaration that defendant Kanipe was a correctional counselor whose

10  duties did not include accessing legal materials for inmates in ad-seg.  Plaintiff counters this

11  evidence with an argument that while defendant Kanipe was a correctional counselor, he was

12  also the MCSP Litigation Coordinator.  However, Plaintiff fails to provide any evidence to

13  support his contention that as the litigation coordinator, defendant Kanipe was responsible for

14  providing legal property to inmates in ad-seg.[29]  The undersigned also notes that, assuming the

15  failure to provide access to his stored legal property is a sufficiently adverse action to support a

16  retaliation claim, Plaintiff fails to allege this adverse action was related to any specific protected

17  activity.  While access to the court is likely to be a protected activity, Plaintiff does not dispute

18  that he had no imminent deadlines in any active litigation.

19    Plaintiff therefore fails to support his claim that defendant Kanipe retaliated

20  against him by refusing him access to his legal documents.  Thus, summary judgment in favor of

21  defendant Kanipe is appropriate.

22  / / /

23

24    [29]    Plaintiff did provide journal entries indicating he sent such requests to defendant
    Kanipe, but failed to provide evidence that such requests were properly sent to defendant Kanipe.
25  (See Pl. Ex. B at 718).  Indeed, other journal entries indicate that Plaintiff was informed that the
    proper individual to obtain legal documents from was the ad-seg property officer.  (See Pl. Ex. B
26  at 836).

1    Claim 10x:  Here, Plaintiff contends the defendants caused him to suffer an

2 adverse transfer to a higher security prison.  Plaintiff does not articulate involvement in any

3 specific protected activity linked to this adverse transfer.

4    The undisputed facts show that Plaintiff was transferred from MCSP to California

5 State Prison - Sacramento (CSP-Sac) on April 29, 2003.  Prior to the transfer, Plaintiff wrote to

6 Warden Knowles indicating he did not want to be transferred, and that he could peacefully co-

7 exist with all inmates on Facility B.  The decision of Plaintiff's future placement would be

8 determined by the interdisciplinary treatment team and the institutional classification committee

9 (ICC) following the adjudication of the RVRs.

10    Defendants argue that the decision whether or not to transfer Plaintiff to another

11 institution was made by a committee based on his custody and security level, recent disciplinary

12 history, and enemy concerns.  In support of this position, the defendants have provided

13 declarations asserting as much, as well as citations to the decision to retain Plaintiff in ad-seg

14 (Def. Ex. A 141), documenting Plaintiff's disciplinary proceedings and enemy concerns, and to a

15 memorandum written to Plaintiff by Warden Knowles indicating the same (Def. Ex. A 185).

16    Plaintiff acknowledges his placement is determined by the ICC, but argues that

17 none of the defendants have personal knowledge of what criteria the ICC uses to determine

18 proper placement.  (See Doc. 210 at 48-49).  He does not, however, respond to the claims in his

19 opposition to the summary judgment motion.   Plaintiff therefore fails to support his claims that

20 defendants Etheredge, Gutierrez, Lattimore, and/or Warren were responsible for the decision to

21 transfer Plaintiff to another institution.  To the extent he argues the transfer was due to the false

22 disciplinary proceedings which these defendants were responsible for, as discussed above,

23 Plaintiff fails to support those allegations as well.  Plaintiff was found guilty in the prison

24 disciplinary proceedings, and has provided no proof that the findings have been reversed.

25 Therefore, his claim that the transfer to another facility was done in retaliation is unsupported.

26 / / /

1    Accordingly, the undersigned finds it is appropriate to grant Defendants' summary

2  judgment motion.

3    **8.    Claim 12**

4    The defendants named in the Supporting Allegations (Counts)
    below then deprived Plaintiff further of secured rights, privileges, and
5    immunities by causing the campaign of retaliatory oppression alleged
    above as Claims 1-11 to continue being perpetrated against him as follows
6    in direct relation to Plaintiff and his associates documenting, reporting,
    publicizing through UNION's Internet web site (1union1.com), and
7    otherwise petitioning for redress of the unlawful events, circumstances,
    and conditions alleged in Claims 1-11 above and in the Supporting
8    Allegations (Counts) below which occurred after and because Plaintiff
    lawfully exercised his right to speak freely in writing after he suffered
9    retaliatory transfer to another prison.
    12a:    Beginning 7/8/03, . . . GUTIERREZ, . . . LATTIMORE . . . caused
10        Plaintiff to suffer retaliatory disciplinary action for lawfully
        expressing himself freely in a confidential grievance letter . . . on
11        6/19/03.
    12b:    Beginning 8/14/03, . . . GUTIERREZ, . . . LATTIMORE . . .
12        caused Plaintiff to suffer retaliatory disciplinary action for lawfully
        expressing himself freely in another confidential grievance letter . .
13        . on 7/30/03.

14    Here, Plaintiff claims he again exercised his unfettered free speech rights which

15  resulted in a retaliatory disciplinary action.  Defendants argue Plaintiff was not engaged in

16  protected activity, and their actions had legitimate penological goals.

17    The undisputed facts show Plaintiff wrote two letters to Appeals Coordinator

18  Hansen, in which he intended to be disrespectful and contemptuous.  As a result of these two

19  disrespectful letters, Hansen issued Plaintiff two RVRs for being disrespectful to staff.[30]

20  Defendant Lattimore was the reviewing supervisor of the reports, but Plaintiff acknowledges

21  defendant Gutierrez  was not involved in either report.

22    Plaintiff's claim for retaliation against defendant Lattimore is unclear.  Plaintiff's

23  disrespectful letter was addressed to Hansen, who was the reporting employee.  Defendant

24  Lattimore's role was as reviewing supervisor.  It appears that at best, Plaintiff's retaliation claim

25

26    [30]    Hansen has been dismissed from this action as the allegations against him in the
    complaint were too vague to state a claim.  (Doc. 150, 153).

1    would be against Hansen, not Lattimore.  However, as Plaintiff's claims against Hansen in his

2    complaint were too vague to state a claim, Hansen has been dismissed.  Defendant Lattimore, in

3    a supervising capacity, cannot be held liable for the actions of another individual.  See Iqbal, 129

4    S. Ct. at 1949.  Therefore, regardless of whether Plaintiff was exercising a protected right in

5    using disrespectful language in his inmate grievances, the RVRs were issued by an individual

6    who is no longer a party to this action.  Therefore, Plaintiff cannot proceed on this claim against

7    defendant Lattimore, as his only involvement was that of a supervisor.[31]

8         The undersigned therefore finds defendant Lattimore met the burden of showing

9    his only involvement in the disciplinary proceedings was as a supervisor who reviewed Hansen's

10    disciplinary write up, and he had no personal involvement, and Plaintiff failed to meet his burden

11    showing otherwise.  Therefore, summary judgment should be entered in favor or defendants

12    Lattimore and Gutierrez .

13    **D.      QUALIFIED IMMUNITY**

14         In addition to the above, or alternatively, Defendants assert that they are entitled to

15    qualified immunity for all of Plaintiff's claims, except Claim 8.  The basis of Defendants'

16    argument is the lack of established authority that First Amendment freedom of speech,

17    expression and assembly are protected activities in a prisoner retaliation claim.  They argue that

18    Plaintiff's underlying premise for his claims, that prisoners enjoy unfettered First Amendment

19    freedom of speech, expression, and assembly protection is in error.  Thus, all of Plaintiff's

20    claims, with the exception of Claim 8 which is based on his having filed a lawsuit, are barred by

21    qualified immunity.

22

---

23      [31]      In addition, while the Ninth Circuit has found prison officials cannot punish a
prisoner for the content of his inmate grievance, that decision was made in a direct First

24    Amendment challenge on the right of redress of grievances.  See Bradley v. Hall, 64 F.3d 1276
(9th Cir. 1995).  While such authority may impact a retaliation claim, that need not be addressed

25    here as Plaintiff's retaliation claim can only be made against Hansen, who is no longer a party,
and the disrespectful language was not contained in an inmate grievance but rather in a letter

26    complaining about the process.

1    Plaintiff responds that Defendants are not entitled to qualified immunity because

2 the First Amendment rights are clearly established.  These First Amendment rights include the

3 freedom of speech, press, assembly and the right to petition the government for redress.   While

4 Plaintiff contends that CDCR prisoners retain all of the First Amendment's generally guaranteed

5 rights, he then acknowledges that Supreme Court has found that some of the First Amendment's

6 rights may be curtailed, at least to a limited degree.

7    As set forth above, the first inquiry in dealing with a motion for qualified

8 immunity, is whether there was a violation of a constitutional right.  The undersigned has found

9 none of Plaintiff's claims rise to the level of a constitutional violation.  However, assuming for

10 this argument that Plaintiff can make out a claim for constitutional violation, the next inquiry is

11 whether that right is clearly established.

12    While it is clearly established that the First Amendment protects free speech, that

13 is not the inquiry here.[32]  Rather, the question is whether unfettered right to freedom of speech,

14 expression, and assembly, is a clearly established right in a prison setting.  The answer there has

15 to be no.  The Supreme Court has recognized that prisoners First Amendment rights may be

16 curtailed in a prison environment where those rights are inconsistent with legitimate penological

17 objectives of the corrections system.  See Pell v. Procunier, 417 U.S. at 822.  Therefore,

18 Plaintiff's contention that he retains unfettered freedom of speech rights while incarcerated is not

19 clearly established.  It then follows that a reasonable officer in a similar situation, faced with a

20 prisoner trying to utilize unfettered free speech,  would not have known that he was violating

21 Plaintiff's alleged rights by squelching that speech.

22    Thus, Defendants should be entitled to qualified immunity as to all of Plaintiff's

23 retaliation claims which are based on his belief that he retains an unfettered right of free speech

24 while incarcerated.  Read in the light most favorable to Plaintiff, those claims which are based

25 _____

26    [32]    It is also clearly established that retaliatory punishment is prohibited.  See Pratt v.
Rowland, 65 F.3d 802, 806 (9th Cir. 1995)

1   solely on his alleged unfettered right to free speech include Claims 3, 5, 7, 9, and 12. Therefore,

2   Defendants should be entitled to qualified immunity on those claims.

3          As to the remainder of the claims, Plaintiff claims retaliation on a variety of other

4   allegedly protected activity, including utilizing the inmate appeals process and filing a civil rights

5   action.  Defendants have acknowledged that Claim 8 is not subject to qualified immunity.  As to

6   Claim 1, Defendants argue qualified immunity is applicable because the protected activity

7   occurred after the alleged adverse action.  That argument is best applied to the merits of the

8   retaliation claim, and as set forth above, the undersigned agrees there can be no retaliation where

9   the protected activity occurs after the alleged adverse action.

10          That leaves Claim 10, wherein Plaintiff alleges various adverse actions based on

11  some vague allegations of protected activity.  As the allegations involved in Claim 10 are vague,

12  and based on a variety of questionable activity, such as making false statements, it is difficult to

13  see how such vague allegations could be clearly established rights.  It is even more difficult to

14  find that a reasonable officer in a similar situation would know he was violating Plaintiff's rights

15  by acting the way Defendants did throughout Claim 10.  Therefore, Defendants should be entitled

16  to qualified immunity against Claim 10.

17  **E.    <u>MOTION TO STRIKE</u>**

18          Plaintiff requests the court strike Defendants' reply as untimely (Doc. 220).

19  Defendants respond to Plaintiff's motion pointing out the opposition was not properly served in

20  which to start the clock running for their reply to be filed.  The undersigned finds the reply is

21  immaterial in that it simply reiterates the arguments presented in the motion.  There are no new

22  arguments or evidence submitted with the reply brief, responding to anything Plaintiff submitted

23  in his opposition.  Regardless of whether it is timely filed or not, the reply does not materially

24  alter the above discussion.  Therefore, the undersigned finds no reason not to grant the motion.

25  / / /

26  / / /

IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Defendants' motion for summary judgment (Doc. 201) be granted;

2.      Plaintiff's motion to strike be granted (220); and

3.      The Clerk of the Court be directed to enter judgment and close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


 DATED:  September 2, 2010

                                             _____
                                             **CRAIG M. KELLISON**
                                             UNITED STATES MAGISTRATE JUDGE